# WHEELING.

Submitted July 1, 1884—Decided July 7, 1884.

## STATE OF WEST VIRGINIA *v.* FREW & HART.

1. Where a contempt is not committed in open court, the usual course is to issue a rule to show cause why an attachment should not issue, though the attachment sometimes issues in the first instance. (p. 436, 471.)

2. Such rule is usually based in cases of constructive contempt on an affidavit or other sworn statement of the facts constituting the alleged contempt, but this is not always essential. The Court may act on its own information or on the unsworn statement of a member of the bar in cases where the facts are clear and unmistakable, such as contemptuous publications in a newspaper. (p. 471.)

3. Where the rule has issued on an unsworn statement of counsel, though it may be defective in form or substance, yet if the defendant appears and answers admitting facts sufficient to constitute the offence alleged against him, the Court will not regard objections to the proceedings for the want of an affidavit or sworn statement or on account of defects in the rule, though the objection is made in the answer. (p. 472.)

4. The Supreme Court of Appeals of this State has the constitutional power to punish, as for contempt, the publication of a libel on the Court or the judges thereof acting in their judicial capacity, made during the term of the Court, with reference to a case then pending and undecided. (p. 457.)

5. The power to summarily punish contempts is inherent in all constitutional courts, springing into existence upon their creation

as a necessary incident to the exercise of the powers conferred upon them, and applies as well to constructive as to direct contempts.   (p. 457.)

6. The act of the Virginia Legislature of 1831 in reference to punishment for contempts of courts, which has been handed down through successive Codes and is now found in chapter 147 of the Code of this State, was not intended to apply and does not apply to the Supreme Court of Appeals.   (p. 465.)

7. In this State the power of the Supreme Court of Appeals to punish summarily both direct and constructive contempts is the same as exists at common law.   (p. 465.)

8. A publication in a newspaper in the city, where the Supreme Court of Appeals is sitting, with reference to a case then pending and undetermined, charging three of the four judges of the Court with attending a political caucus more than a year before, and in the caucus advising the action, out of which the case arose, and promising the caucus to hold its action legal and proper, and charging the Court with agreeing to decide the case before an approaching political convention for political purposes is a *contempt* of said Court, which it may summarily punish.   (p. 466.)

JOHNSON, PRESIDENT, furnishes the following statement of the case:

On the 24th day of June, 1884, Henry M. Russell, a member of the bar of this Court, presented the following communication:

"*To the Honorable Judges of the Supreme Court of Appeals of West Virginia.*

"As is well known to the Court, there was pending here on the 18th day of June, 1884, and there is now pending and undetermined, a proceeding by *mandamus*, at the relation of Joseph S. Miller, Auditor, against T. H. Buchanan, assessor of Brooke county.   This proceeding involves the constitutionality of the exemption act, contained in section 43 of chapter 12 of Acts of 1881 and the propriety of what is well known throughout the State as the 'supplemental assessment order.'

"I have the honor to be a member of the bar of this Court and to be the counsel for the relator in the cause referred to.

"On the 18th day of June, the *Wheeling Intelligencer* a newspaper of general circulation published in the city of Wheeling,

contained an editorial article, referring expressly to the questions I have mentioned as involved in said cause and referring by implication to that cause itself. This article stated that three out of the four judges of your honorable Court had told a Democratic caucus, more than a year ago, in effect that the Court would sustain the 'supplemental assessment order' and hold the exemption statute unconstitutional. The article then says that it was not intended that 'the purpose of the Court' should be made public, and intimates that the publication of its purpose 'may induce the Court to change its mind.' I beg leave to submit with this communication, a copy of the newspaper containing the article referred to.

"This article has every appearance of an attempt to affect the decision of the Court in the case of *Miller* v. *Buchanan*, and to intimidate it into deciding against the relator. While I do not believe that any effect will be produced upon the Court which will affect the case, still I deem it my duty as an officer of the Court and as counsel for the relator, not to permit so palpable an assault upon the purity and independence of the administration of justice to pass unnoticed.

"The firm of Frew, Campbell & Hart, composed of John Frew, A. W. Campbell and C. B. Hart, are, as I am informed, the publishers of the *Wheeling Intelligencer*.

"Should the members of this Court so far forget their duty and dignity as to express in advance, for political or other purposes, their opinions upon cases which may come before them, as judges, no one would be quicker than I to condemn such a practice. If it could be shown me that any of your honors had been guilty of what the *Intelligencer* lays to your charge, I would willingly join the editors of that paper in bringing the matter before the proper tribunal at the proper time. But whether these matters are true or false, the case of *Miller* v. *Buchanan* is now pending and you alone must decide it. While it is before you, your conduct with respect to the case itself and the questions in it is not the proper subject, in my opinion, of public criticism.

Disclaiming any feeling of resentment or animosity against the publishers of the *Intelligencer*, and acting solely from a desire to do my professional duty, I now lay the matter be-

fore the Court, and shall not feel that I am called upon either to suggest to the Court what it shall do in the matter, nor to take part in the prosecution of any proceedings which may be instituted, should the Court see fit to act.

"With great respect,

"HENRY M. RUSSELL.

"*June* 23, 1884."

Thereupon the Court issued the following rule against the defendants, returnable on Saturday, June 28:

"Henry M. Russell, esq., a member of the bar of this Court, this day presented a written communication addressed to the Court referring to the fact that on the 18th day of the present month of June the case of the *State of West Virginia ex rel. Joseph S. Miller, Auditor,* v. *T. H. Buchanan, assessor of Brooke county,* upon a petition for *mandamus,* was in this Court pending and undetermined; that said case involved the constitutionality of the exemption act contained in section 43, chapter 12 of the Acts of 1881, and the propriety of what is well known throughout the State as the 'supplemental assessment order;' that he was the counsel for the relator in said case; and that on the said 18th day of June, the *Wheeling Intelligencer,* a newspaper of general circulation published in the city of Wheeling, contained an editorial article referring to the question involved in said case, and by implication to the case itself. With this communication is presented a copy of said newspaper containing said article. The Court is informed that Frew, Campbell & Hart, consisting of John Frew, A. W. Campbell and C. B. Hart, are the proprietors and publishers of said newspaper, and that said C. B. Hart is the chief editor thereof. The said editorial article is as follows:

"'The State campaign seems to be shaping itself. It leaks out that the Supreme Court of Appeals is to be brought to the rescue in a decision affirming the constitutionality of the exemption act, and declaring the supplemental assessment order to be lawful and right. This is in effect, what was promised by the three Supreme Court judges to the Democratic caucus before the order was issued.

"'It might be thought strange that anybody could know what the decision of the Supreme Court is to be on any

question. But it seemed equally strange that three out of four judges of the Supreme Court told the Democratic caucus more than a year ago to go ahead and rely on the backing of the Court.

" 'The present understanding is that the decision is to be rendered before the meeting of the Democratic State Convention in order to simplify the situation. It is also understood that this move is not intended to advance the interests of Hon. E. Boyd Faulkner.

" 'Of course it was not intended that the purpose of the Court should be made public, and publicity may induce the Court to change its mind, just to show that somebody has been taking liberties with the text and misrepresenting the Court. We shall see what we shall see.'

" It is therefore considered and ordered by the Court that a rule be and is hereby awarded against the said John Frew, A. W. Campbell and C. B. Hart, proprietors and publishers of said *Wheeling Intelligencer*, and said C. B. Hart, chief editor thereof, commanding them and each of them to appear before this Court on Saturday morning, June 28, at ten o'clock, to show cause, if any or either of them can, why they and each of them shall not be attached for their contempt of this Court in publishing the aforesaid article.

" It is further ordered that service of a copy of this order on the said parties above named, shall be considered as service of the said rule."

On the said 28th day of June the defendants appeared and severally filed their answers to said rule.

The return of the rule shows that A. W. Campbell was not at home, and had been absent from the State for months. The rule was discharged therefore as to him.

John Frew filed his answer as follows:

"IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA.

" In the matter of a rule against John Frew, A. W. Campbell and C. B. Hart.

" And now comes the said John Frew, and for answer to the said rule to show cause why he should not be attached for a contempt of this Court respectfully says:

"1. That the said proceeding is irregular and said rule was improvidently awarded, because said rule was not entered upon a complaint or other information supported by affidavit, setting forth the matters complained of, but appears to have been entered by the Court of its own motion, for matters not occurring in the presence of the Court and of which the Court had no judicial knowledge. Respondent in support hereof relies upon, and refers to, the statement of H. M. Russell, esq., this day presented to the Court.

"2. That the said proceeding is irregular and the said rule was improvidently awarded, because it is not set forth either in the said rule or in the communication upon which it purports to be based, at least in part, that the respondent was at the time of the publication of the editorial article complained of, one of the editors, proprietors or publishers of the said *Wheeling Intelligencer*, or in anywise connected therewith.

"3. That the matters complained of in the said rule or communication did not constitute misbehavior in the presence of the Court, or so near thereto as to obstruct or interrupt the administration of justice, or violence, or threats of violence to a judge or officer of the Court, or to a juror, witness, or a party going to, attending, or returning from the Court, for or in respect to any act or proceeding had, or to be had, in any such Court, or misbehavior of an officer of the Court in his official character, or disobedience or resistance of any officer of the Court, juror, witness or other person, to any lawful process, judgment, decree or order of the said Court, it being provided by section 27 of chapter 147 of the Code of West Virginia that the courts and judges thereof may issue attachments for contempts and punish them summarily only in the cases hereinbefore stated.

"4. That on the 18th of this present month of June and before that time this respondent had no knowledge, information or belief that the case of *The State of West Virginia ex rel. Joseph Miller, Auditor*, v. *T. H. Buchanan, Assessor of Brooke county*, upon a petition for *mandamus* was in the said Court of Appeals pending and undetermined; or that said case involved the constitutionality of the exemptions contained in section 43 of chapter 12 of the Acts of 1881, or the propriety of what has been called the 'supplemental assess-

ment order;' or that H. M. Russell, esq. was counsel for the relator in said case.

"That respondent had no part in the preparation of the editorial matter complained of, or any knowledge or information of the preparation or publication of the same until after the same had been published, when he saw it in print in said *Wheeling Intelligencer*.

"5. Respondent believes it to be true that on the 23d day of June, 1884, being the date of the said communication, and on the 24th day of June, 1884, when the order in this matter was made by this Honorable Court awarding the said rule, Frew, Campbell & Hart, consisting of John Frew, A. W. Campbell and C. B. Hart, were the proprietors and publishers of said *Wheeling Intelligencer*, and C. B. Hart was the chief editor thereof. Respondent further believes it to be true, that on the 18th day of June, 1884, an editorial article in the words quoted in the said rule was published in the said *Wheeling Intelligencer*.

"Wherefore this respondent respectfully submits that the said rule to show cause why he should not be attached for contempt should be discharged.

                                                    "JOHN FREW.

"W. P. HUBBARD,
"JNO. A. HUTCHINSON,
            "*Attorneys for Respondent.*"

The said answer is sworn to.

C. B. Hart answered as follows:

"IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA.

"In the matter of the rule against John Frew, A. W. Campbell and C. B. Hart.

"And now comes the said C. B. Hart and for answer to the said rule to show cause why he should not be attached for a contempt of this Court, respectfully says:

"1. That the said proceeding is irregular and said rule was improvidently awarded, because said rule was not entered upon a complaint or other information supported by affidavit setting forth the matters complained of, but appears to have been entered by the Court of its own motion for matters not occurring in the presence of the Court, or of which

the Court had no judicial knowledge. Respondent in support hereof relies upon and refers to the statement of H. M. Russell, esq., this day presented to the Court.

"2. That the said proceeding is irregular and the said rule was improvidently awarded, because it is not set forth either in the said rule or in the communication upon which it purports to be based, at least in part, that the respondent was at the time of the publication of the editorial complained of one of the editors, proprietors or publishers of the said *Wheeling Intelligencer* or in anywise connected therewith.

"3. That the matter complained of in the said rule or communication did not constitute misbehavior in the presence of the Court, or so near thereto as to obstruct or interrupt the administration of justice, or violence or threats of violence to a judge or officer of the Court, or to a juror, witness, or party going to, attending, or returning from the Court, for or in respect to any act or proceeding had, or to be had, in any such Court, or misbehavior of an officer of the Court in his official character, or disobedience or resistance of any officer of the Court, juror, witness, or other persons to any lawful process, judgment, decree or order of the said Court; it being provided by section 27 of chapter 147 of the Code of West Virginia that the courts and judges thereof may issue attachments for contempts and punish them summarily, only in the cases hereinbefore stated.

"4. Respondent believes it to be true, that on the 23d day of June, 1884, being the date of the said communication, and on the 24th day of June, 1884, when the order in this matter was made by this Honorable Court awarding the said rule, Frew, Campbell and Hart, consisting of John Frew, A. W. Campbell and C. B. Hart, were the proprietors and publishers of the said *Wheeling Intelligencer* and said C. B. Hart was the chief editor thereof. Respondent further believes it to be true, that on the 18th day of June, 1884, an editorial article in the words quoted in the said rule was published in the said *Wheeling Intelligencer.*

"5. That before the 31st day of August, 1883, there was published in the *Greenbrier Independent*, a newspaper of general circulation, published in the State of West Virginia, an editorial article referring to the questions involved in what

has been called the 'supplemental assessment order,' and the propriety of the act of the Governor in suggesting to the Auditor the issuing of a circular to assessors requiring them to assess property exempt from assessment under section 43 of chapter 12 of the Acts of 1881, and the propriety of the act of the Auditor in issuing such order. The said article stated that the Governor had called together in conference the leading Democratic members of the Legislature, and further stated: 'That all, however, approved of the suggestion that the Governor should direct such a letter as he afterwards wrote to the Auditor, and that the Auditor should issue a circular to the assessors instructing them to assess all property not legally exempt from taxation. Three of the judges of the Court of Appeals were consulted as to the scope of their decision, and to them were submitted a letter and circular, which they examined, revised and approved.'

"The decision there referred to was that of the Court of Appeals in the case of the *Chesapeake and Ohio Railway Company* v. *Miller*, 19 W. Va. This respondent is not in possession of a copy of the *Greenbrier Independent* containing the said article and has not had time to procure one since the issuing of the said rule. A copy of the said article, however, was published in the *Wheeling Daily Intelligencer* of August 31, 1883, and a copy of the *Intelligencer* of that date containing the said copied article is herewith filed as part of this answer and the Court is asked to refer to the same.

"The editor and publisher of the *Greenbrier Independent* at the time the last mentioned article was published, was Mr. B. F. Harlow, a man of good character and standing, a lawyer by profession, being, as respondent believes, a member of the bar of this Court, and was a man of considerable pecuniary means. He belonged, and still belongs, to the same political party as the Governor, Auditor, and all the members of this Court, as it was constituted at the time of the said publication, and as it is now constituted. He resides in the same town as one of the judges of this Court, and as respondent has been at all times informed, and now believes, is, and was at at the time of such publication, a warm and intimate personal friend of that judge. It is plain that that article was not unfriendly to the Court or intended to be so, the object

of its publication evidently being to defend and justify the
Governor and Aunitor, and not to attack the Court.   That
article, however, in effect said, that three members of this
Court had in advance expressed their opinion upon cases
which might come before them as judges.   It contained a
serious charge against those judges.   It constituted a libel
for which, if untrue, the editor and publisher of the *Green-
brier Independent* was liable to conviction upon indictment,
and was responsible for damages in a civil action.   If any-
thing published in the *Wheeling Intelligencer* of June 18, 1884,
could be construed as a contempt of this Court, that publica-
tion in the *Greeenbrier Independent* was likewise such con-
tempt.   No proceedings against Mr. Harlow for contempt,
however, have been instituted in or by this Court or by any
of its judges.   None of its judges have brought an action for
libel against Mr. Harlow or made complaint upon the crimi-
nal side of the courts against him, although the judges of
this honorable Court, and each of them, must have known,
and respondent believes did know, of these statements from
a time shortly after their publication.   None of the said
judges, and no one of them, has in any manner denied the
charges so made by Mr. Harlow, and no retraction or quali-
fication of those charges has ever been made in any public
manner, or to the knowledge of this respondent.   The state-
ments so made by the *Greenbrier Independent* were brought
to the knowledge of Jacob B. Jackson, then Governor of the
State of West Virginia, and Joseph S. Miller, Auditor of the
said State, each of whom more than once assented to the
truth of the statement so made in this respect by the *Green
brier Independent.*   The said Jackson and Miller were, by
reason of their official position, likely to know, and respond-
ent believes they did know, whether the said statements of
the *Greenbrier Independent* were true, and aside from their
official position they are, and always have been, men of good
standing and reputation.

"Respondent respectfully submits that if the statements
contained in the *Greenbrier Independent* were true it was the
duty of the *Wheeling Intelligencer* and its editors, publishers
and proprietors, including its chief editor, on the 18th day
of June, 1884, and at all other times, to make public those

statements, and that on the 18th day of June, 1884, they were under the circumstances hereinbefore stated -justified in believing the truth of those statements. The said editorial article was based upon those statements, referred to them, and was known and understood by every one who read it, to relate to those statements.

" Respondent respectfully suggests that if any question is now made as to the truth of those statements, said B. F. Harlow, Jacob B. Jackson and Joseph S. Miller be examined as witnesses at the bar of this Court, or in such other manner as may be in accordance with law and the practice of this Court, and that such other evidence be taken as may be pertinent and proper.

" Sometime since the said Joseph S. Miller was a candidate for the nomination for Governor at the hands of the Democratic State Convention called to meet in Wheeling on the 23d day of July, 1884. Subsequently, and about the 7th day of June, 1884, he wrote and published a letter declining to be such candidate. Very soon afterwards the said Miller presented to this Honorable Court a petition for a *mandamus* against T. H. Buchanan, assessor for Brooke county, and an effort was made in his behalf to push that proceeding to an early decision. It was understood among the friends of Mr. Miller's candidacy that that effort was made in order that if the decision should be favorable to the Auditor, Mr. Miller might still go before the convention as a candidate for nomination as Governor with hopes of success. For evidence of this, respondent refers to the affidavit of T. J. Parsons filed herewith.

" At the time this Honorable Court granted the rule at the suit of said Miller, Auditor, and fixed the return day thereof, which was but six days off, the Court publicly announced that the respondent, Buchanan, must be prepared to go on with the argument of the matter upon the return day, and caused the clerk of this Court to so inform Mr. Buchanan by letter, which is herewith produced and filed. This proceeding upon the part of the Court was unusual as respondent is informed and believes. The editors, publishers and proprietors of the *Intelligencer* were before the 18th day of June, 1884, informed of the facts last hereinbefore stated, except

the existence of the letter from the clerk of the Court to Mr. Buchanan, but did not then know what they have since learned that the provision of law requiring the assessor to complete his books by the 1st day of July, may have operated as a reason for such action of the Court, that fact not having been stated, either in the public announcement of the Court or in the letter of its clerk.

" Under such circumstances the editorial article complained of was written and published. It is not true that it was an attempt to affect the decision of the Court in the case of *Miller* v. *Buchanan* or to intimidate the Court into deciding against the relator. No editor, publisher or proprietor of the *Intelligencer* had any interest in that case, none of them knew of its existence on or before the 18th day of June, 1884, except he who on that day was the chief editor of the paper. The then chief editor supposed that the decision of the case might have a political effect in the State, but supposed also that which ever way it was decided the effect would be such as he desired. If he had any preference in the matter from his political standpoint it was that the Court should decide in favor of the Auditor.

" The publication of the said editorial article was not made with a view to induce any particular decision by the Court, or to affect in any way its determination of the case, and respondent is unable to see how it could be construed by any one as being so intended. In its publication there was no intention to commit or express a contempt of the Court and no such feeling was entertained by the then publishers and editors of the *Intelligencer*. The date of the publication may have been untimely, and if it had been considered that the publication of the said article could be construed by any one as an attempt to intimidate or influence the Court in the case of *Miller* v. *Buchanan* no such article would have been published during the pendency of that case.

" The fact that such case was pending simply served to bring to mind the statements of the *Greenbrier Independent*, the facts mentioned by Mr. Parsons and the action of the Court in awarding the rule against Mr. Buchanan, and so suggested the publication of the article complained of.

"Wherefore this respondent respectfully submits that the

said rule against him to show cause why he should not be attached for contempt should be discharged.

"C. B. HART.

"W. P. HUBBARD,
"JNO. A. HUTCHINSON,
        "*Attorneys for Respondent.*"

The answer is sworn to.

The letter of H. M. Russell, esq., referred to in the answer is here copied:

"WHEELING, W. VA., June 26, 1884.

"DEAR SIR:—There has just been handed to me your letter of this date, referring to the rule issued by the Supreme Court of Appeals against Frew, Campbell and Hart suggesting that you had information leading you to suppose that my communication on which that rule was based, was not made at the instance of my client, Mr. Miller, but was made at the instance, more or less direct of the members of the Court, or some of them; and requesting me to inform you what part was taken by any member of the Court in suggesting the communication, or in counseling or conversing with me on the subject.

"I have no idea what use you desire to make of the information, but as my connection with the proceeding now pending against your clients ended with the presentation to the Court of the communication referred to, and as nothing took place between me and any member of the Court which I, or so far as I can perceive, the Court could have any reason to conceal, I very cheerfully comply with your request, but stating as nearly as I can remember, all that occurred. If I am prolix, and state circumstances which have no relevancy to the point you wish to reach, it will be because I don't know what that point is.

"On one or other of the days on which the case of *Miller* v. *Buchanan* was argued before the Court I was in Judge Johnson's room waiting for the Court to convene and chatting on indifferent matters. Allusion was made to the editorial which had appeared in the *Intelligencer* of the 18th, and I stated that I thought it was a very improper article to be published while the case was pending before the Court, and seemed intended to intimidate the Court into deciding the

case against the Auditor.   I said that I thought some notice ought to be taken of it.   Judge Johnson condemned the article, but intimated in language which I do not remember, that the Court would not notice it.   I said that I would do so, though without saying when or how I proposed taking action.   Judge Johnson asked me not to do so, at least until the case had been argued and submitted, and after we had left the subject and had begun speaking of other matters, he returned to it and repeated his request, and I so far yielded to it as to defer action until after the case had been heard.

"On Friday evening the argument of the case was concluded.   On Saturday afternoon I met Judge Johnson in the lower corridor of the capitol, and he then said to me that the judges of the Court had been talking over the matter, and that while personally they would prefer to let it pass unnoticed, yet they had concluded that a proper regard for the dignity of the Court required them to take action of some kind; that as I was of counsel in the case with reference to which the article was published, and had already expressed an intention of moving in the matter, they thought I would be a proper person to bring the matter before the Court. I replied that my purpose to do so still held; that I had only delayed because of his request, and because I had been too busy with the argument of the case to attend to it. Judge Johnson then commented on the article and on the necessity of the Court's protecting itself from attacks of the kind, and spoke of Mr. Hart's deserving imprisonment and Mr. Frew a fine.   I said that I thought it would be very injudicious to imprison Mr. Hart, as it would create sympathy for him and perhaps arouse a feeling against the Court. We then separated, I repeating that I would bring the matter up at the first opportunity.

"On the same afternoon I called on Judge Johnson at his room.   After talking over our conversation I said to him that my relations with Mr. Hart's family were very pleasant, and that there were circumstances existing in Mr. Hart's family of a very painful nature—which I related to Judge Johnson, but which I need not now repeat—that would make it very cruel to imprison Mr. Hart.   I added that unless it was understood that there should be no imprison-

ment, I would have to drop the whole thing. The judge replied that what I had said at our last interview about imprisonment had struck him as very proper but that at any rate, the circumstances which I related to him would be sufficient, upon being brought to the attention of the Court to prevent Mr. Hart's imprisonment. I then said I would go on with the proceedings as I had at first proposed to do. We then had some conversation about the practice in such proceedings and I told him I would be ready to present the case on the following Tuesday morning, and left him.

"From that time I had no conversation or communication of any kind with the Court or any members of it, until Tuesday morning, the day on which my communication was presented.

"On Monday the communication was prepared. It was not shown or read to any person whatever until I read it in open court, nor did I speak of it to any person so far as I now remember. Mr. Miller was not spoken to on the subject, because I considered the action I was about to take entirely proper for me, as an officer of the Court, to take on my own motion. While I might have refrained, on account of my relation to his case, had I had any reason to suppose that he would have objected, I did not deem it necessary for him to be consulted, or his assent secured in advance. The duty was not a pleasant one; it was quite as much mine as his and I did not care to shirk it at his expense.

" On Tuesday morning one or both of the daily papers stated that the Court had adjourned from Monday until Wednesday, though I had learned from the crier of the Court that the statement was incorrect.

" On returning to my office a few minutes before ten o'clock on that day, I learned that Judge Johnson had stopped a short time before and had left word that he wanted to see me. Going to the capitol, I found Judges Johnson and Green walking together in the upper corridor. Approaching, I referred to the message I had received, and Judge Johnson replied that he thought I might have been misled by the statement in the paper about the adjournment of the Court, and as I had asked him whether Court would be in session on Tuesday and had said that I would then be ready to present this matter, he had stopped to tell me that Court

would be in session.  He asked if I had the papers prepared.
I had them in my hand, and said yes.  Judge Green asked
if I had mentioned in my papers that Mr. Hart was the chief
editor.  I said I had not.  Judge Green said I ought to do
so, as the responsibility of the editor might be different from
that of publisher.  I said I thought that if either desired to
escape on the ground that the other was more guilty, I
thought that was a matter which should be set up by the
defence.  Judge Green took the opposite view.  Judge John-
son coincided with me.  The discussion of the subject was
interrupted by the striking of the hour, and we all went into
the court-room.

"At no time did I have any conversation with Judge
Woods or Judge Snyder on any phase of the subject; nor
with either Judge Green or Judge Johnson, except as I have
related.  It has not been possible for me nor have I attempted
to repeat the whole of any of the conversation *verbatim;* but
I think I have given the substance of all of them, so far as
they bore in any manner on the subject about which you
enquire.

"I think you are correct in saying that my communication
to the Court leaves it to be inferred that it was made wholly
of my own motion, but I do not think that anything in that
communication justifies the inference that I had had no con-
versation with any member of the Court.

"So far as the communication itself was concerned that
was prepared, as I have said, without consultation with any
one, and no member of the Court had any part in its prepa-
ration, or knew, in any manner, what was in it, until I read
it in open Court.

"So far as my action in presenting the communication was
concerned I regarded it, and now regard it, as my own from
first to last.  I attributed Judge Johnson's speaking to me
on Saturday solely to the fact that he had previously requested
me not to act, and to his desire to withdraw that request.
Had the suggestion emanated in the first instance from the
Court, or any member of it, my communication would cer-
tainly have given to the Court, and not attributed to myself,
the credit of the suggestion.     "With great respect,

"*To  W. P. Hubbard, esq.*          "HENRY M. RUSSELL.

"The foregoing was prepared immediately upon the receipt of your letter and without conference or consultation with any one. Since writing it I have read it to Judge Johnson, who agrees with me that the statements relative to himself are accurate.                    "HENRY M. RUSSELL."

The article in the *Intelligencer* of August 31, 1883, referred to in C. B. Hart's answer is as follows:

### "HOW THEY DID IT.

"The startling series of desperate efforts to increase taxation without letting the people into the secret, not very cunningly devised by the high priests of the Democratic party in West Virginia, keeps the press of that party busy denying and explaining. Here is a remarkable explanation from the *Greenbrier Independent,* whose territory was recently invaded by the Board of Public Works:

"'The Republican press has criticised mostly severely and unjustly the conduct of the Governor and Auditor in giving certain instructions to the assessors as to their duties, and has charged that these officials have acted arbitrarily and without conferring with leading members of their own party. We happen to be in a condition to give a few facts in this connection not heretofore published, and which, in justice to these officials, should be known.

"'After the decision of the *Chesapeake and Ohio Railway* v. *The Auditor, &c.,* in which the Court of Appeals held distinctly that all property, not exempt from taxation by the Constitution, should be taxed, and when it was apparent that unless the revenue was increased there would not be funds sufficient in the treasury to meet the appropriations which the Legislature had already made, the Governor called together in conference the leading Democratic members of the Legislature, including the chairmen of both the Senate and House finance committees. He made known to them the importance of increasing the revenue, called their attention to this decision of the Supreme Court, and suggested that the law should be made to conform thereto. Most of those present approved this suggestion, but thought that at that time in the session a proper bill could not be passed, while some thought that in view of the decision of the Court

of last resort further legislation was unnecessary. They
all, however, approved of the suggestion that the Governor
should address such a letter as he afterwards wrote to the
Auditor, and that the Auditor should issue a circular to the
assessors, instructing them to assess all property not legally
exempt from taxation. Three of the judges of the Court of
Appeals were consulted as to the scope of their decision, and
to them were submitted the letter and circular, which they
examined, revised and approved.'

" Letters patent ought to have been secured on a device of
this kind before giving it to the world. The irreducible
school fund was exhausted; the State owed one hundred and
forty thousand dollars to a Wheeling bank; the previous
Legislature had dodged a tax-levy and ordered a reassess-
ment; there were no more funds to be taken contrary to
law; the sitting Legislature was as lacking in courage as its
conspicuously cowardly predecessor; 'it was apparent that
unless the revenue was increased there would not be funds
sufficient in the treasury to meet the appropriations which
the Legislature had already made.' And what was to be
done? When West Virginia Democratic politicians are
about to do anything of moment—to 'slate' a United States
Senator or fix up a tax job—they call a caucus, not large
enough to be troublesome, of a nice, handy, manageable
size. This tax caucus seems to have been a select affair.
The Governor, the Auditor, the chairmen of two committees,
the leading Democratic members of the Legislature, there
were not many of these if they were all called—and three
judges of the Supreme Court.

" We are very glad that this painful statement does not
come from a Republican newspaper, which might be sus-
pected of exulting in the State's shame because of the parti-
san advantage that might result. If three judges of the high-
est legal tribunal in the State did consent to go into secret
political caucus on a matter which might be submitted for
the judgment of their Court, it is well that the revelation is
made by one in political sympathy with those judges, with
the caucus in which they took a prominent part, and with
the outcome of that novel meeting. It takes nothing from
the disgrace of the proceeding that the three judges are not

said to have sat with the members of the Legislature. The Governor and the Auditor were the connecting links between the Legislature and the judicial ends of the mixed caucus. The managers had decided what to do and how to do it, and the judges 'examined, revised and approved' the how.

"Here was a proceeding of which the public was ignorant. Not even the Legislature knew what was going on. Not even the Democratic side of that Legislature was advised, only the two chairmen and 'the leading Democratic members.' The double-ended caucus agreed upon a way to help the party out of the mire of financial difficulty—three judges of the Supreme Court said it was a good enough way —and soon the edict went forth. It might be thought that the Attorney-General would have been the proper person to 'examine, revise and approve' a circular which was to declare to assessors that certain personal property previously exempt was to be taxed by the Democratic party in caucus assembled. The Attorney-General would have done well enough for an ordinary occasion, but here was something more than the mere giving an opinion which the Supreme Court might reverse. Something more than framing a circular to put into execution a well-defined law.

"In the Chesapeake and Ohio case the Supreme Court had passed upon that case and nothing more. Nothing more was before the Court. The officials in charge of the State finances wanted to know where the Court would stand on the act to exempt certain products of the workshop and farm, and three of the four judges of the Supreme Court of Appeals—mark the very great presence of mind in committing a good working majority—said that the caucus was on the right track, that the exempted property couldn't be exempted, and then and there declared what the judgment of the Court would be if the question were to come before it. Here is at least one important case settled, so far as the Supreme Court of Appeals can settle it, in secret and with no argument except that of partisan expediency.

"Perhaps there is no truth whatever in the report of this disgraceful proceeding. But it comes from a respectable Democratic newspaper which seems to speak by authority, and it is made in defence of the party, not to destroy it or

any public officers for whom it is responsible. No·chapter of recent reassessment history is so shameful."

The affidavit of T. J. Parsons also referred to in said answer is as follows:

" STATE OF WEST VIRGINIA,

"*Ohio County, ss.:*

"Personally appeared before me, Joseph R. Paull, a notary public in and for said ·county, T. J. Parsons, who being duly sworn says on his solemn oath:

"I reside in Moundsville, Marshall county, West Virginia, and am an attorney-at-law.

" On some day in the present month which I am unable to fix more definitely than that it was after the petition had been filed by Joseph S. Miller, Auditor, in the Supreme Court of Appeals, and before the case was argued I was in company with Col. Robert White, of Wheeling, and L. S. Newman, of Marshall county, at the dinner table of the Henratta House in Moundsville. Both these gentlemen are prominent and active Democratic politicians and Col. White is a lawyer practicing in Wheeling, and a member of the bar of the Court of Appeals. I am a Republican. These two gentlemen were not then acquainted with me, or if they knew me, did not recognize me. On the occasion I have mentioned these gentlemen conversed earnestly about the political situation in this State, their favorite candidates for different offices and the chances of such candidates for success. Both of them spoke warmly in favor of Joseph S. Miller, now State Auditor as a candidate for Governor. Col. White said to Mr. Newman that in case the assessment order which had been made by the Auditor should be held constitutional by the Supreme Court· of Appeals, Mr. Miller would, notwithstanding his previous letter of declination, be a candidate before the Democratic State Convention to be held July 23, next, for nomination for Governor and would be successful. · In that connection Col. White said it would be. the object of Mr. Miller's counsel in the *mandamus* case to push it to an early decision because of the effect that such a decision if favorable to Mr. Miller would have on his candidacy before the convention and on the general interests of

the Democratic party. Towards the close of the conversation I took part in it, and said that what Mr. Miller had done with regard to the assessment order had been done in the interest of the Democratic party, and I didn't think it fair to shoulder on him all the political consequence of such order. This remark I presume led Col. White to suppose that I was a Democrat, for after dinner he approached me and requested me to come to the Democratic Convention of July 23, as a delegate in favor of Mr. Miller. I informed him that I was a Republican. Since that I have not heard Col. White say anything on the subject.

" T. J. PARSONS.

"Subscribed and sworn to by the said T. J. Parsons before me in my said county this 27th day of June, 1884.

"JOSEPH R. PAULL,<br>" <em>Notary Public in and for Ohio county.</em>"

The Court declined to appoint counsel to represent the State in the matter. At the request of the defendants' counsel the hearing of the matter was delayed, the Court fixing July 1 for the hearing. On that day the counsel for defendants argued the question presented; and the case was taken under consideration by the Court.

*John A. Hutchinson* and *W. P. Hubbard* for respondents.

JOHNSON, PRESIDENT:

It is claimed in the answers, that the proceedings in this case are irregular; that the rule is too vague and indefinite and ought only to have issued upon affidavit. There is no sufficient irregularity in the proceedings here, that would justify the Court in discharging the rule, as clearly appears by the opinion of brother Snyder, which meets my entire approval. The main question, the one most discussed at the bar, is: Has the Court the power to punish summarily a constructive contempt of the character described in the rule? It is insisted, that the power to punish for contempt is limited by sections 27 and 28 of chapter 147 of the Code. The said two sections are as follows:

"27. The courts and judges thereof may issue attachments for contempts and punish them summarily only in the cases

following: First, misbehavior in the presence of the court or so near thereto as to obstruct or interrupt the administration of justice; secondly, violence or threats of violence to a judge or officer of the court or to a juror, witness, or party going to, attending or returning from the court, for or in respect of any act or proceeding had, or to be had, in such court; thirdly, misbehavior of an officer of the court in his official character; fourthly, disobedience or resistance of any officer of the court, juror, witness, or other person to any lawful process, judgment, decree or order of the said court."

" 28. No court shall, without a jury, for any such contempt as is mentioned in the first class embraced in the preceding section, impose a fine exceeding fifty dollars or imprison more than ten days. But in any such case the court may impanel a jury (without an indictment or other formal pleading), to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict."

It is also insisted, that the Legislature had the right thus to limit the powers of courts over the subject of contempts and entirely prohibit the courts from punishing summarily such a constructive contempt, as is set up in the rule. Counsel cite the following authorities to sustain this position: *State* v. *Storey,* 79 Ill. 48; Wharton's Pl. & Pr. §§ 957–961; Trial of Judge Peck, pp. 87, 91, 92, 295, 400, 426; Const. of State, arts. 3, 6 § 39; *Ex parte Bollenan and Swartwout,* 4 Cranch 93; *Ex parte Hardy,* 68 Ala. 303; *State* v. *Woolley,* 11 Bush 95; *Whittem* v. *State,* 36 Ind. 196; 20 Am. Law Reg. 432; 1 Wood. & M. 440; *State* v. *Galloway,* 5 Coldw. 326; *Ex parte Hickey,* 4 Sm. & M. 776; *People* v. *Yates,* 6 Johns. 337; *Hummel's Case,* 9 Watts 431; 42 Cal. 412; *Wheeling* v. *B. & O. R. R. Co.,* 13 Gratt. 40; *Lindsay* v. *Com's,* 2 Bay 61; *Hoover* v. *Wood,* 9 Ind. 286; *Ireland* v. *Turnpike Co.,* 19 Ohio St. 373; *State* v. *Sauvinet,* 24 La. Ann. 119; *Hill* v. *Crandall,* 52 Ill. 70; *Lewis* v. *McElvain,* 16 Ohio 347; *Ex parte Schenck,* 65 N. C. 353; *Weaver* v. *Hamilton,* 2 Jones' Law 343; *In re Daves,* 81 N. C. 72; *In re Walker,* 82 N. C. 95; *Cromartie* v. *Com'rs,* 85 N. C. 211; *Dunham* v. *State,* 6 Iowa 245; *State* v. *Anderson,* 40 Iowa 207; *Ex parte Edwards,* 11 Fla. 185; *Stuart* v. *People,* 3 Scam. 395; *Batchelder* v. *Moore,* 42 Cal. 412; *Rutherford* v. *Holmes,* 5 Hun 317; *Newton* v. *Com.,* 1 Grant's

Cas. 453; *Middlebrook* v. *State*, 43 Conn. 258; *Deskin's Case*, 4 Leigh 685.

The case in 79 Illinois was a proceeding against Storey for contempt of court and publication of certain articles in *The Chicago Times* reflecting upon the action of the grand jury in finding indictments against him in said court. The court below found him guilty and sentenced him to imprisonment in the county jail. To this judgment he obtained a writ of error. Mr. Justice Scholfield in delivering the opinion of the court, after referring to the fact that there was no allegation, that the publication of the articles is calculated to prevent the obtaining of a competent petit jury to try the respondent on the several indictments, or that the judge, whose duty it will be to preside during such trial, will in anywise be affected thereby in the discharge of his duty, said:

"The only question therefore is, assuming the articles to be libelous, whether the publishing of a libel on the grand jury or on any of the members thereof because of an act already done, may be summarily punished as a contempt. We do not understand the articles as having a tendency directly to impede, embarrass or obstruct the grand jury in the discharge of any of its duties remaining to be discharged after the publications were made. * * * All that it would seem could be claimed is, that the publications would cause disrespect to be entertained by the public for the grand jury and for its actions in the particular cases criticised and thereby to that extent to bring odium upon the administration of the law. That this is a grave offence, deserving of prompt and severe punishment might be conceded without in the slightest degree strengthening the position that it may be treated and punished as a contempt of court. * * It is not denied by counsel for respondent that courts may punish, as for contempt, those who do any act directly tending to impede, embarrass or obstruct the administration of the law, but they deny that any publication, however disrespectful, when applied to jurymen in regard to the manner in which they have already discharged a duty, does or is calculated to impede, embarrass or obstruct the administration of the law.

"Authority may be found in the text-books and in

English and American cases holding a doctrine at variance with this position. Thus for instance Blackstone says contempts of courts may be committed 'by speaking or writing contemptuously of the court or judges acting in their judicial capacity; by printing false accounts, (or even true ones without proper permission) of causes then depending in judgment, and by anything in short that demonstrates a gross want of that regard and respect, which, when courts of justice are deprived of their authority, (so necessary for the order of the kingdom,) is entirely lost among the people.' But the law in relation to contempts has never been held in any case decided by this court to be so indefinitely broad, as it is thus settled by Blackstone. Our Constitution and statutes certainly affect the question to some extent; and it is only in determining how, for they do so, that we have any difficulty. A statute of this State in force for many years provided, that the circuit and supreme courts should have power to punish contempts offered by any person to them while sitting, and for disobeying their process, rules and orders issued and made conformably to law. And this court held in *Stuart* v. *The People*, 3 Scam. 402, that this statute might be regarded as a limitation on the power of courts to punish for any other contempts, and newspaper articles commenting on the conduct of a juror, who was also the editor of a rival political paper to that in which the articles were published and reflecting contemptuously upon the judge published during the pendency of a trial for murder, were held not to authorize an attachment for contempt. It was said in that case in speaking of the power to punish, as for contempt, in cases of mere libels upon the court having no direct tendency to interfere with the administration of the law:

" It does not seem necessary for the protection of courts in the exercise of their legitimate powers, that this one so liable to abuse should also be conceded to them. It may be so frequently exercised as to destroy that moral influence, which is their best possession until finally the administration of justice is brought into disrepute. Respect to courts can not be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence, and whilst they are found

upon the judgment seat, so long and no longer will they retain the public confidence. If a judge be libeled by the public press he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country; and if he has received an injury ample remuneration will be made."

"In the more recent case of *The People* v. *Wilson*, 64 Ill. 195, a majority of the court held, that the publication of an article indirectly charging, that money had been used to procure a decision favorable to the defendant in a case pending before this court on writ of error, was a contempt, and the court accordingly imposed fines upon the editor and publisher of the newspaper, in which the offensive article was published.

"Authorities were referred to in support of the positions assumed by one or more of the members of the court in that case, and a train of reasoning pursued in the separate opinions delivered, from which the court below may have inferred, and probably did infer, assuming that the law had not since then been materially changed in this respect, that any libel upon the court or jury, whether tending directly to interfere with the administration of the law or not, might be punished for a contempt. But the decision turned upon the point, as will be seen by reference to the opinion of the chief justice, that the cause in reference to which the article was published, was *then pending* before the court, undecided, and that the article was *calculated* to and was *designed* to influence the members of the court in deciding it. Had the law therefore as then in force remained unchanged, it would be difficult to sustain the conviction of the respondent. But since the decision of that case the statutes have been revised, and the provision in regard to contempts before quoted has been repealed, leaving no statute in force on that subject, except in regard to the enforcement of decrees in chancery and the punishment of certain specific offences, such as the failure of juries to attend in obedience to summons, the failure of officers to make service and return of writs, &c.

" Courts however possess certain common-law powers, subject to modifications that may have been imposed by our Constitution and statutes, among which is included that of

punishing for contempts. Different opinions have been
entertained by members of this court at different times in
regard to the extent of such modifications; and we feel con-
strained, in giving expression to our views in the present
case, to disagree to some extent with remarks made by some
of the members composing the majority of the court in *Wil-
son's Case, supra.*

"In our opinion it is not admissible, under our Constitu-
tion, that a publication however libelous, not directly calcu-
lated to hinder, obstruct or delay courts in the exercise of
their proper functions, shall be treated and punished sum-
marily as a contempt of court."

The court held that the constitutional provision, "that
every person may freely speak, write and publish on all sub-
jects, being responsible for the abuse of that liberty; and in all
trials for libel both civil and criminal the truth, when pub-
lished with good motives and for justifiable ends, shall be a
sufficient defence," applies to words spoken or published in
regard to judicial conduct and character.

I do not understand this case as overruling *People* v.
*Wilson*, but it does dissent from the broad ground taken by
some of the judges in that case. It is true that Wharton in
his Criminal Pl. & Pr. takes the ground that a contempt of
the character now under consideration cannot be summarily
punished. But *Bishop*, 2 Crim. L. section 259, takes an
opposite view of the question. In the celebrated case of
Judge Peck, there was nothing decided, as I understand it,
except that the Senate of the United States believed that the
action of the judge was an error of judgment. It seems to me
apparent that Lawless was not guilty of a constructive contempt
unless a dignified criticism of the opinion of the court is such
contempt; a position that would not be taken by any court.

In *Woolley's Case*, 11 Bush it was held that the right of
self-preservation is an inherent right in the courts not de-
rived from the Legislature, and cannot be made to depend
upon the legislative will. Whether the Legislature might
interfere with the manner, in which courts protect themselves
from insults and indignities, was doubted and left an open
question. This was a contempt to the court of appeals of
Kentucky and was punished by a fine.

*Arnold* v. *The Comm.* 80 Ky. 300, was a writ of error to a judgment in a contempt case, the contempt having been committed in the presence of the court. Judge Pryor in delivering the opinion of the court said: "It is conceded that the court has the inherent power to punish by fine and imprisonment for such a contempt, and it might be added the Legislature has no power to take from the court the power to protect itself from such flagrant contempts, as was offered to the court in this particular case, (which was an assault upon the attorney for the State while prosecuting a man for murder) and to sanction the exercise of such legislative action, would in effect defeat the administration of justice. * * * The right to punish for contempt without the intervention of a jury, was recognized, and is fully established by the rule of the common-law, and when the exercise of the power is admitted, the fact that a jury may be called in to aid the court, in determining the question of the punishment to be inflicted, is in no manner objectionable. While the right to punish is in the court, we are not prepared to say that it is not subject in some degree to legislative control; but on the contrary we are inclined to adjudge that a mere arbitrary discretion on the part of the judge may be limited; but an attempt by legislation to deprive the courts of the inherent power of protection against assaults and indignities would be disregarded. * * * That it is a contempt of court is not denied, but as the statute provides no mode of trial or of bringing the party before court for trial, it is urged that it must be by indictment. There was no warranty for providing a mode of trial. The mode of conducting such a proceeding was established by the rule of the common law, * * * that is, by an attachment or rule against the party charged with the contempt. * * * The question of the right of trial by jury in cases of contempt has been often raised but always denied. *Ex parte* Grace 12 Ia. 208, and several other cases are cited by Judge Pryor as sustaining this position.

*Whittem* v. *State,* 36 Ind., shows, that the Legislature in that State has given, if it could give, power to the courts to punish either direct or constructive contempts. It seems to me the case of *State* v. *Galloway,* 5 Cold., properly decides

nothing, except that a judgment for contempt by an inferior court could not be reversed. The criminal court of Memphis pronounced judgment of fine and imprisonment upon a charge of contempt against Galloway and Rhea, the editors and publishers of the *Memphis Avalanche.* The alleged contempt was an editorial article published in said paper, purporting to give the particulars and denouncing the judge of the court as guilty of official corruption in discharging upon bail a prisoner indicted in that court for felony. The publication was made a day or two after the discharge of the prisoner on bail. The Tennessee Code provided, that " the power of the several courts of this State to issue attachments and inflict punishments for contempt of court shall not be construed to extend to any except the following cases: The provisions are similar to ours in most respects, but the sixth clause provides in general terms for " any other act, or omission declared a contempt by law." The court said of this clause, " that it was not intended to embrace and did not embrace the vast and undefined scope of contempts at common-law, outside of the clauses prescribed by statutory enactments." The court further said, that no writ of error lay to the judgment, and a judgment refusing to discharge the prisoner on *habeas corpus* could not be reversed; that the " power of the courts to punish for contempts without appellate supervision, though absolutely essential to the protection, efficacy and existence of the courts, is nevertheless capable of being exercised unwisely and corruptly. Absolute and complete protection or redress against such injudicious or improper exercise of the power is in its nature, as to many cases impossible to be given. In the organization and and maintenance of government it is impossible to avoid the necessity of reposing powers in functionaries, whose action must be final and inevitable." The court seemed to think that the power of the court in the case before it was improperly exercised, but it was not subject to review.

The case in 4 Smedes & Marshall, is not decided by the supreme court of Mississippi, and the opinion there pronounced and so much relied on in the argument before us was the opinion of a single judge of the supreme court pronounced in discharging a prisoner on writ of *habeas corpus.*

Another judge under like circumstances expresses a different opinion in *ex parte Adams*, 25 Miss. 883, in which he held, that "the right of courts of justice to punish by fine and imprisonment for contempts of their authority is an inherent right pertaining to them, which they can exercise independent of any statute." But in *Watson* v. *Williams*, 36 Miss. 331, which was heard on appeal the court held: "The right of punishing contempts by summary conviction is a necessary attribute of judicial power, inherent in all courts of justice from the very nature of their organization, and essential to their existence and protection and to the due administration of justice. It is a trust given to the courts not for themselves, but for the people whose laws they enforce, and whose authority they exercise, and each court has the power for itself finally to adjudicate and punish contempts without interference from any other. The right to punish for contempts extends not only to acts which directly and openly insult and resist the powers of the court, or the persons of the judges, but to indirect and constructive contempts which obstruct the process and degrade the authority of the court."

The court said in *Batchelder* v. *Moore*, 42 Cal. 412: "The power of a court to punish for an alleged contempt of its authority, though undoubted, is in its nature arbitrary, and its exercise is not to be upheld, except under the circumstances and in the manner prescribed by law." It did not then appear, that the statute did not confer ample power for the proper protection of the courts, and this authority therefore recognizes the right of the Legislature to limit and regulate but not to take away the right of self-protection from the courts.

In *ex parte Schenck*, 65 N. C. 353, it was held that "the act of April 4, 1871, declaring that no attorney who has been duly licensed to practice law shall be debarred or deprived of his license and right to practice, except upon conviction for a criminal offence or after confession in open court is constitutional; that said act does not take away any of the inherent rights which are absolutely essential in the administration of justice." This case does not overrule *ex parte*

*Moore* or *ex parte Biggs*, in 63 and 64 N. C.   To these last cases I will refer in another part of this opinion.

In *Walker's Case*, 82 N. C. 95, it was held, that it was unlawful to imprison for more than thirty days for a contempt of court, citing the statute.   The constitutionality of the act is not discussed, and it seems to be admitted by the court that the Legislature has the right to regulate the power to punish for contempts

Again *Cromartie v. Com'rs*, 85 N. C. 211, was a construction of a statute without considering its constitutionality; and it was held that "under the Act of 1868–9 chapter 117, the court has no power to *punish* a contempt already committed by an imprisonment of indefinite duration, but it may by proceedings *as* for contempt coerce obedience to any lawful order by imprisoning the contumacious party, until he shall comply."

*Dunham v. State*, 6 Ia. 245, was a writ of error to the judgment of the circuit court, punishing for a contempt an editor for a libel on the court during a trial; and the court held, reversing the judgment, that "the publication of articles in a newspaper, reflecting upon the conduct of a judge in relation to cases pending in his court, *and which were disposed of before the publication*, or the publication of the evidence and arguments of counsel in a case undisposed of, in which there was no rule of court prohibiting such publication, however unjust and libelous the publication may be, do not amount to contemptuous or violent behavior towards the court, under chapter 94 of the Code, nor are they so calculated to impede, embarrass or obstruct the court in the administration of the law, as to justify the summary punishment of the offender under that chapter."   In that case the court said:   "We are strongly inclined to think however, that the provisions of the Code upon this subject must be regarded as a limitation upon the power of the courts to punish for any other contempts.   We can conceive of no possible state of case in which the exercise of this power might become necessary for the protection of the court, or the due administration of the law, that is not covered by these provisions.   If such a case could by possibility arise, we would not say that by virtue of its inherent power, the punishment might not be inflicted."   They admit the right

to regulate the power, but not to take away any that is necessary for the courts in properly administering the law.

In *State* v. *Anderson*, 40 Ia. 207, it was held, "that the publication by an attorney in a newspaper, criticising the rulings of the court in a case tried and determined prior to the publication does not constitute contemptuous or violent behavior toward the court, punishable as contempt. Whether the publication if made during the pending of the trial, would justify the court in punishing the writer for contempt, *quære.*"

In *ex parte Edwards*, 11 Fla. 174, it was held: "In the absence of any statutory limitation or restriction, the power of the several courts over the matter of 'contempts' is omnipotent and its exercise in any particular case is not to be questioned by any other tribunal. It is the great bulwark established by the common-law for the protection of courts of justice, and for the maintenance of their dignity, authority and efficiency. By our statute the power to punish for 'contempts' is limited to fine and imprisonment, the fine in any case not to exceed one hundred dollars, or imprisonment thirty days, and this statute is made to apply as well to courts of equity as to courts of common-law. As applicable to courts of chancery, the restrictions in the statute must be confined to such acts as are the subject merely of *punishment*. It never was designed to deprive that court of its ancient authority to enforce its affirmative orders or decrees, or any order or decree, whether affirmative or otherwise, which may be pronounced at the final hearing of the cause." The court says of the power of courts over the subject, p. 186: "This is the great bulwark established by the common-law for the protection of courts of justice, and for the maintenance of their dignity, authority and efficiency, and neither in England nor in the United States has this unrestricted power been seriously questioned."

In *Rutherford* v. *Holnes*, 5 Hun 317, it is held by the supreme court of New York, not the court of appeals, which is the court of last resort: "The power to punish for contempt is, in its nature, an exception to the provisions of the Constitution, and it cannot be extended in the least degree, beyond the limits which has been imposed by statute." This was a review of a contempt-proceeding by a justice of the peace.

In *Middlebrook* v. *The State*, 43 Conn. 257, it was held: "The statute is not to be regarded as conferring the power to punish for contempts, but merely as regulating an existing power. The power is inherent in all courts."

In delivering the opinion of the court Carpenter, J., said: "But independently of the statute we think the power is inherent in all courts. A court of justice must of necessity have the power to preserve its own dignity and protect itself. *In re* Cooper 32 Vt. 257; *State* v. *Woodfin*, 5 Ired. L. 199; *Stephen's Case*, 404. Many other cases might be cited to the same point but it is unnecessary, as we aware of no authority directly in point to the contrary."

I have reviewed the strongest cases cited by counsel to sustain their position, and deem it unnecessary to refer to their other citations more particularly.

Judge Cooley in his work on Torts 424, says: "It has also been held in many cases that the publication of an article in a newspaper commenting on proceedings in court then pending and undetermined, or upon the court in its relation thereto, made at a time and under circumstances calculated to affect the cause of justice in such proceedings, and obviously intended for that purpose, may be punished as a contempt, even though the court was not in session when the publication was made. Such a publication when made, however, is a continuous wrong, as much as would be something of a physical nature, planned in advance and so arranged, as that its natural and necessary results should be to throw the court into disorder and confusion when its sitting should commence."

In *Spalding* v. *The People*, 7 Hill 301, it was said by Nelson, C. J.: "The remedy by indictment is ofttimes found too tardy for the exigency of the case; and hence the law has always authorized the mere summary proceeding by attachment as for a criminal contempt, whereby the offender is arraigned at once upon the charges and the course of justice more promptly vindicated and sustained. As has been well remarked in reference to this subject, laws without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory. A power in the courts of justice therefore to suppress such contempts,

by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal."

In *Yates* v. *Lansing*, 9 Johns. 417, Platt, Senator, said: "A contempt is an offence *against the court* as an organ of justice; and the court can rightfully punish it on summary conviction, whether the same act be punishable as a crime or misdemeanor, on indictment or not. * * * A conviction on indictment will not purge the contempt; nor will a conviction for contempt be a bar to an indictment."

In *Rutherford* v. *Holmes*, 66 N. Y. 369, it was held: "A court of a justice of the peace has no power to adjudge a person in contempt and to punish him therefor save in the cases prescribed in the statute." Andrews and Miller, Judges, dissented. The two dissenting judges must have thought that even a justice of the peace could not be by statute deprived of his necessary power to punish for certain contempts.

In *Matter of Kerrigan*, 33 N. J. L. 344, it was held: "The power to punish by commitment for contempt is a power belonging only to judges of certain courts, and does not arise from the mere exercise of judicial functions. The power so far as it may be exercised by judicial officers is an incident to a court, belonging alike to civil and criminal jurisdiction, but not extending at the common-law, below such as are courts of record, recognized in the common-law."

In *Cartwright's Case*, 114 Mass. 238, Gray, C. J., said: "The summary power to commit and punish for contempts tending to obstruct or degrade the administration of justice is inherent in courts of chancery and other supreme courts as essential to the execution of their powers, and to the maintenance of their authority, and is a part of the law of the land within the meaning of Magna Charta and of the twelfth article of our declaration of rights."

In *State* v. *Matthews*, 37 N. H. 450, it was held, that "the authority to punish contempt is a necessary incident, inherent in the organization of all legislative bodies, and all courts of law or equity."

In *Sturo's Case*, 48 N. H. 428, it was held: "The publication of an article in a newspaper printed and circulated in

the place where a court is sitting, reflecting in severe and opprobrious terms on the character of a criminal prosecution then pending in court and standing in order for trial, if the publication is made at a time and in circumstances such as would naturally bring it to the notice of jurors and others who are in attendance upon the court, is a contempt of court and punishable as such by summary process."

In *Morrison* v. *McDonald*, 21 Me. 550, it was held: "The power to commit for contempts of court is incidental to all courts of record."

In *Gaudy* v. *The State*, 13 Neb. 445, it was held: "The district court has authority to punish by proceedings for contempt.any person who attempts to corrupt or unlawfully influence jurors in a case pending before the court." It was further held, that "as the proceeding was solely to protect justice from obstruction,'the accused is not entitled to a trial by jury."

In *State* v. *Williams*, 2 Spee. 26, it was held: "The seventh and eighth clauses of the act of 1839 in relation to the office of constable, which prescribe the proceeding by indictment in cases of official misconduct, do not supersede or impair a judge's common law jurisdiction over the subordinate officers of court, so as to deprive him of the power without indictment of punishing a constable for contempt, or of ordering him to be put under a rule to show cause why he should not be stricken from the roll for official misdemeanor coming under the observation of the judge himself, or which may be brought to his knowledge through official channels. The remedy provided by this act is rather to be regarded as cumulative than exclusive."

In the old case of *Respublica* v. *Oswold*, 1 Dal. 319, decided by the supreme court of Pennsylvania in 1788, it appears from the opinion of McKean, C. J., that it was a motion for an attachment against Eleazer Oswald printer and publisher of the *Independent Gazetteer*. That an action for libel had been instituted in that court, in which Andrew Brown was plaintiff and said Oswald defendant; that a question with respect to bail in the action had been agitated before one of the judges, from whose order discharging the defendant on common bail the plaintiff had appealed to the court; and that

Oswald's appeal to the public through his paper, which was the immediate subject of complaint, related to the action then pending before the court. It was contended that the published address was intended to prejudice the public mind upon the merits of the cause, by propagating an opinion that *Brown* was the instrument of a party to persecute and destroy the defendant; that he acted under the particular influence of Dr. Rush, whose brother was a judge of the court, and in short from the ancient prejudices of all the judges the defendant did not stand the chance of a fair trial. The chief justice said: "Assertions and imputations of this kind are certainly calculated to defeat and discredit the administration of justice. Let us therefore enquire *first* whether they ought to be considered as a contempt of the court; and *secondly*, whether the offender is punishable by attachment." The court decided both questions in the affirmative; and the following judgment was pronounced by the chief justice: "Eleazer Oswald, having yesterday considered the charge against you, we were unanimously of the opinion that it amounted to a contempt of the court. Some doubts were suggested, whether even a contempt of the court was punishable by attachment; but not only my brethren and myself, but likewise all the judges of *England* think that without this power no court could possibly exist; nay that no *contempt* could indeed be committed against us, we should be *so truly contemptible.* The law upon the subject is of immemorable antiquity, and there is not any period when it can be said to have ceased, or discontinued. On this point therefore we entertain no doubt. But some difficulty has arisen with respect to our sentence; for on the one hand we have been informed of your circumstances, and on the other we have seen your conduct; your circumstances are small, but your offence is great and persisted in. Since however the question seems to resolve itself into this, whether you shall bend to the law or the law shall bend to you, it is our duty to determine that the former shall be the case. Upon the whole therefore the COURT pronounces this sentence : That you pay a fine of ten pounds to the *commonwealth*; that you be imprisoned for the space of one month, that is from the 15th day of July to the 15th day of August next; and after-

wards until the fine and costs are paid.   Sheriff he is in your custody."

In *Passmore's Case*, 3 Yeates 441, decided by the same court in 1802 it was held:   "The publication of a paper to prejudice the public mind in a cause depending is a contempt, if it manifestly refers to the cause though it does not expressly appear on the face of the writing.   But however libelous the paper may be the court can have no cognizance of it in a summary way, unless it be a contempt."   In that case the publication related to the plaintiff in a civil suit against said Passmore.   Shippen, C. J., said:   "However libelous the publication complained of may be, we have no cognizance of it in this summary mode, unless it be a contempt of the court. 2 Atk. 469.   But we are unanimously of opinion that in point of law it is such a contempt, and readily concur with Lord Hardwicke that 'there cannot be anything of greater consequence than to keep the streams of justice clear and pure, that parties may proceed with safety both to themselves and their characters.'   *Ib.* 461.   If the minds of the public can be prejudiced, by such improper publications, before a cause is heard, justice cannot be administered.   The defendant has set at naught the advice we gave him when we ordered the attachment.   He has made no atonement whatever to the person whom he has so deeply injured, and he can only blame himself for the consequences.   The judgment of the court is, that the defendant pay a fine of fifty dollars to the commonwealth, and be imprisoned in the debtors' prison for thirty days, and afterwards until the fine and costs are paid."

On April 3, 1809, the Legislature of Pennsylvania passed an act, the second section of which provided, that "publications out of court respecting the conduct of the judges, officers of the court, jurors, witnesses, parties or any of them, if in and concerning any cause pending before any court of this commonwealth, shall not be construed a contempt of the said court, so as to render the author, printer, publisher, or either of them liable to attachment and summary punishment for the same, &c., but authorizes a proceeding by indictment for the same, and gives the party aggrieved his action at law to recover damages for the injury sustained."

No case from Pennsylvania has been cited and none found by us, in which the constitutionality of this act has been declared or even discussed.

In the case of *Hummel and Bishoff*, 9 Watts 416, a section of the contempt-law was construed on writ of error, and it was held the defendants were officers within the meaning of the act of June 16, 1836, restricting the powers of the several courts to issue attachments, and to inflict summary punishments for contempts of court, and affirmed the judgment of the court below, summarily punishing the defendants.

It will be seen that in none of the numerous authorities, which we have cited, has it been expressly held, that it is within the legislative power to so limit the right of the courts of record, as to take from them their inherent power to punish summarily constructive contempts, when the exercise of such right is essential to the administration of justice. But in a number of cases it has been held that the Legislature cannot impose such limit.

In *Hughes* v. *The People*, 5 Col. 436, it appears that the Code of Colorado provided, that "the following acts or omissions shall be deemed a contempt:" (then follow the classes). The court evidently did not regard the contempt as coming within the provisions of the statute; and Stone, J., in delivering the opinion of the court, said: "Aside from the inapt language and faulty manner of expression these enumerated causes of legal contempt in the Code are much narrower than the common-law." Then after quoting the language of Breese, J., in *Stuart* v. *People*, 3 Scam. 395, that the language of the statute might with great propriety, "be regarded as a limitation upon the power of the court to punish for any other contempt," further says, "while we do not think upon the whole case this language intended to declare a doctrine so broadly as is contended for it, there are on the other hand ample authorities for the more reasonable doctrine, that such a statutory enumeration of causes as is found in our Code, when applied to the ever varying facts and circumstances, out of which questions for contempt arise, cannot be taken as the arbitrary measure and limit of the inherent power of a court for its own preservation and for that proper dignity of authority, which is essential to the effective administration of justice."

In *Woolley's Case*, 11 Bush 95, Lindsay, J., said: "We will not in this case determine, whether under the Constitution the legislative department under the guise of regulating proceedings in cases of contempt can take from the judiciary the power to preserve its independence and equality by protecting itself against insults and indignities. The right of self-preservation in an inherent right in the courts. It is not derived from the Legislature and cannot be made to depend upon legislative will. The power of the legislative department to interfere with the manner in which the judicial department shall protect itself against insults and indignities is denied by the supreme court of Arkansas (*State* v. *Morrill*, 16 Ark. Rep. 324,) and doubted by the Supreme Court of the United States. (*Ex parte Robinson*, 19 Wall. 510). It remains an open question in this State and we intend in this case to so leave it."

In *People* v. *Wilson*, 64 Ill. 195, it was held that "the power to punish for contempts is an incident to all courts of justice independent of statutory provisions; that the statute which declares that the supreme court 'shall have power to punish contempts offered by any person to it while sitting' merely affirms a pre-existent power and does not attempt to restrict its exercise to contempts in the presence of the court but leaves them to be determined by the principles of the common-law. And if a statute should be regarded as a limitation upon the power of the court to punish for any other contempts than those committed in its presence, yet in this power would necessarily be included all acts *calculated* to impede, embarrass or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court." And the supreme court of Illinois in that case punished by attachment the publisher and editor of a newspaper for publishing in a city of the State remote from where the court was sitting a charge of bribery against the court on account of its action in a case pending on a writ of error.

In *ex parte Moore*, 63 N. C. 397, the supreme court of North Carolina asserted the right to punish summarily for contempt an attorney at its bar for a publication of an article in a newspaper reflecting on the court and published when the

court was not in session. And the court held : "A court has power to require the members of its bar to purge themselves from a charge of *contempt* incurred by their publishing over their names in a newspaper libelous matter, directly tending to impair the respect due to its members." The objectionable language used toward the court was as follows : "The judges of the supreme court singly or *en masse* moved from that becoming propriety so indispensable to secure the respect of the people, and throwing aside the ermine rushed into the mad contest of politics under the excitement of drums and flags \* \* \* and will yield to every temptation to serve their fellow-partisans, and are unfit to hold the balances of justice."

In the case of *State* v. *Morrill*, 16 Ark. 384, the court directly holds, that a statute taking away the right of a court summarily to punish for a constructive contempt is unconstitutional. The court in an able and elaborate opinion by English, C. J., held, that it had the constitutional power to punish as for contempt for the publication of a libel made during a term of the court in reference to a case then decided and imputing to the court officially *bribery* in making the decision; "such power being inherent in courts of justice springing into existence upon their creation as a necessary incident to the exercise of the powers conferred upon them," and that "the Legislature may regulate the exercise of but can not abridge the express or necessarily implied powers granted to this court by the Constitution;" that the statute (Digest, chapter 36 section 1) "so far as it sanctions the powers of the courts to punish as contempts the acts therein enumerated, is merely declaratory of what the law was before its passage;" that the prohibitory clause is entitled to respect as an opinion of the Legislature but is not binding on the courts ; that "by the common-law the courts possessed the power to punish as for contempt libelous publications upon their proceedings, pending or past, upon the ground that they tended to degrade the tribunals, destroy that public confidence and respect for their judgments and decrees so essentially necessary to the good order and well being of society, and most effectually obstructed the free course of justice;" that "when the supreme court was created by the Constitu-

tion and certain judicial powers conferred upon it, the power to punish contempts of its authority was impliedly given to it as a necessary incident to the exercise of its express powers."

In *Dandridge's Case* 2 Va. Cases 408, it appears that the circuit judge being about to enter the court-house for the purpose of opening court, Dandridge, who was standing at the door, grossly insulted him, charging him with *corruption* and *cowardice* in delivering an opinion in a case at a previous term of the court, in which Dandridge had some interest. Proceedings for contempt having been instituted against him, the case was adjourned to the general court of Virginia on account of its importance, novelty and difficulty. By the general court the whole doctrine of constructive contempt is discussed thoroughly and ably, and the conclusion was reached that the conduct of the defendant was punishable as a contempt.

It is conceded here in the argument that it is not in the power of the Legislature to take from courts the inherent power possessed by them to punish contempts in the face of the courts; but it is insisted that the Legislature may at will deprive the courts of the power to punish summarily constructive contempts such as that described in the rule. At common-law, as clearly appears in *Dandridge's Case,* the power to punish for such constructive contempts was as much an inherent because a necessary power, as to punish for direct contempts; and as we have seen, this position is abundantly sustained by authority. Does not the reason for the existence of the power as much obtain in the one case as the other? If an attorney at the bar should charge the court in its presence with being bribed to decide the cause under argument against his client, no one would doubt for a moment the right of the court to summarily punish him for such contempt. Why? Not because he had interrupted the court in its despatch of business; for there was no interruption in the hearing of the cause. The court would have the right to punish the offender, because the language used was designed and calculated to destroy the confidence of the people in the court and to degrade the court in the opinion of the public and to corrupt the streams of justice. In such case the court would be wanting in respect for the people, whose servant it is, if it

did not summarily punish the offender. There may not have been a half dozen persons in the court-room to hear the charge of corruption against the court, yet it would be not only the right but the duty of the court to punish such a contempt. Is it not absurd to say, that if the same attorney had published the same charge in a newspaper printed in the town where the court was sitting which was read by thousands, aye read in the court-room within view of the court it was designed to affect, he would not be guilty of a contempt of court, for which he should be summarily punished? If a suit for libel would be an ample vindication, as is stated by the judge, who delivered the opinion in *Stuart* v. *The People*, 3 Scam., in the one case, a slander suit would be in the other. Such a suggestion is disgusting to a man of honor. It will be a sorry day when the practice shall obtain among judges of the court of last resort, who hold the dearest interests of the people in their hands, where in their judicial capacity they may be grossly libeled to leave their high positions and go before a jury in a libel-suit, be subjected to the coarse criticism of defendant's counsel, and if they succeed in their suit, have it cast in their teeth, that they were influenced by sordid motives. Who would have any respect for a judge who would pursue such a course? Would he not under such circumstances deserve the contempt of every good citizen? Besides what right would he have individually to recover damages for a wrong committed against him in his judicial capacity, for an injury done the people in his person? In such cases the individual must always be separated from the judge. The court has no right to punish as for contempt one who libels an individual, who happens to be the judge; but it is a contempt of the court, as such, and an insult to the people represented by the court, which alone the *court can* punish as such. Scarcely less repulsive to all sense of judicial dignity is the suggestion that the judge should play the role of prosecuting witness in the trial of an indictment for libel. If that day shall ever come, when such shall be the only protection left to courts of justice against publications affecting their judicial integrity, none but the base and vicious can be expected to occupy judicial position.

It was well and truly said by the high court of errors and

appeals of Mississippi in *Watson* v. *Williams*, 36 Miss. 341: "In this country all courts derive their authority from the people, and hold it in trust for their security and benefit. In this State all judges are elected by the people, and hold their authority in a double sense directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents. It is the authority and law emanating from the people, which the judges sit to exercise and enforce. Contempts against these courts, in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law whom they employ in the conduct of their government. The power to compel the lawless offender against decency and propriety, to respect the laws of his country and submit to their authority (a duty to which the good citizen yields hearty obedience without compulsion) must exist, or courts and laws operate at last as a *restraint* upon the upright who need no restraint, and a license to the offenders whom they are made to subdue."

We are well aware that the trust reposed in us to protect the people's court from degradation is a *delicate* as well as a sacred trust. The power claimed, it is said, is arbitrary and liable to abuse. That is no reason why the power should not exist and be reposed somewhere. The few instances in which this power has been used during the last century, shows that it was wisely placed and may be safely left in the hands of the courts. It is well established by the authorities, that the power is inherent in courts of justice to summarily punish constructive as well as direct contempts. And in this country, where the courts are in the divisions of power by the Constitutions of the several States constituted a separate and distinct department of government clothed with jurisdiction and not expressly limited by the Constitution in their powers to punish for contempt, the inherent power that is thus necessarily granted them cannot be taken away by the legislative department of the government. The supreme court of Arkansas in 16 Ark. page 390, said: "The Legislature may regulate the exercise of, but cannot abridge the express or necessarily implied powers granted to this court by the Constitution. If it could, it might encroach upon

both the judicial and executive departments, and draw to itself all the powers of government, and thereby destroy that admirable system of checks and balances, to be found in the organic frame-work of both Federal and State institutions, and a favorite theory in the governments of the American people."

It is not claimed, that the power to punish contempts need be exercised in this country to the same extent allowed by the common-law. Mr. Justice Scott, in *Neel* v. *State*, 4 Eng. 263, said: "It has never been contended in this country, that the common-law, although it is our birthright, and in force among us, without express recognition by our Constitution and laws, was ever actually in force in all its length and breadth, but only to an extent that was not wholly inconsistent with these great principles, upon which our free institutions, purely American, have been reared and maintained. So these doctrines, which we are considering, (*powers of courts to punish contempts*,) in being recognized by the courts must be regarded as having received a corresponding abatement of those of its lineaments which are at open war with the nature and character of our Constitution, and the actual state of things among us, under its legitimate operation, or it would be an exotic that could not germinate in our soil." Therefore courts will tolerate the regulation of the power, so that the Legislature does not by such regulation substantially destroy the efficiency of the court.

The courts must have just enough power and will exercise it for their own protection, and they want and demand no more. Whether or no the Legislature in its regulation has left sufficient power for the purpose, the court, which is called to exercise it, must be the sole judge, unless its judgment may be reviewed, and in that case the court of last resort would be the exclusive judge. There is no disposition in the courts to seek opportunities to exercise this power; and it will not be exercised, unless there is a necessity for it. When a judge remembers that he has no right to avenge in this manner individual wrongs, but only an injury to the court, the people's court, it becomes a matter of stern and inflexible duty, from the performance of which under his official oath he dare not shrink. For he well knows, that as

the ermine was spotless; when he put it on, the people expect him to leave it as untarnished for his successor.

We have thus far been considering whether the Legislature has the right to limit the power of courts created by Constitutions. It is very different as to its power over courts of its own creation.

In *ex parte Robinson*, 19 Wall. 505, it was held that Congress had the power to limit the right of the circuit and district courts of the United States to punish contempts because they were the creations of Congress. Mr. Justice Field in delivering the opinion of the court in perfect accord with the authorities we have cited said: "The power to punish for contempts is inherent in all courts; its existence is essential to the promotion of order, in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence, and invested with jurisdiction over any subject they become possessed of this power. But the power has been limited and defined by the act of Congress of March 2, 1831. The act in terms applies to all courts; whether it can be held to limit the authority of the supreme court, which derives its existence and powers from the Constitution, may perhaps be a matter of doubt. But that it applies to the circuit and district courts, there can be no question. These courts were created by act of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is therefore to them the law specifying the cases in which summary punishments for contempts may be inflicted."

We have already seen that the power of courts created by the Constitution to punish contempts is an inherent power without which they might wholly fail in the object of their creation. When a court is created and exists by some legislative act, it follows that the power which creates, must confer, and can take away its jurisdiction at its pleasure. As a consequence of this, the same power, can define contempts against, and prescribe the measure and mode of punishment, or even withhold altogether from such court, the power to punish the same. These are not questions of power, but of expe-

diency only, and of this the Legislature must judge. But if the court be created, and its jurisdiction conferred by the Constitution, then the power to punish for contempts inherent in such court, also exists by virtue of the Constitution, and in the absence of any constitutional provision authorizing the Legislature to do so, it cannot deprive such court of that power.

It is contended, however, that the general court of Virginia in the case of the *Commonwealth* v. *Deskins, &c.,* reported in 4 Leigh, decided, that the act of the General Assembly, passed on April 16th, 1851, defining contempts, and limiting the power of the courts to punish the same, deprived the courts of the power to punish summarily any contempts, except those therein enumerated. It is not necessary to contend that section 25 of that act, was not warranted by the Constitution of Virginia, adopted in 1776, or by the amended Constitution adopted on the ⸺ day of April, 1830; for by both of said Constitutions, the jurisdiction of all courts created or existing, was conferred by legislative act, and not by constitutional provision. The case of *Commonwealth* v. *Dandridge*, already referred to, was decided by the general court in 1824, and that of *Commonwealth* v. *Deskins, &c.,* in 1834. The case of Dandridge was decided under the Constitution of 1776.

Before the Revolution the "general court" was the supreme criminal tribunal. Before the reign of James II. the colonial assembly exercised appellate jurisdiction in civil cases. In 1683 the King directed that appeals should be allowed from the inferior courts to the general court. Up to the time of the Revolution, this court consisted of the Governor and Council for the time being, any five constituting a court. It had jurisdiction to hear and determine all causes, matters and things whatsoever, relating to or concerning any person or persons, ecclesiastical or civil, or to any person or thing whatsoever the same should be, whether brought before them by original process, appeal from any inferior court, or by any other way or means whatever, provided, the matter in controversy was of the value of ten pounds sterling or two thousand pounds of tobacco. It also had exclusive criminal jurisdiction as a court of oyer and terminer of all cases of free persons, wherein the judgment

on conviction was loss of life or member; and of all offences
of blasphemy and irreligion, where the punishment was
incapacity of any sort or imprisonment; and of proceedings
in cases of incestuous marriages. See Acts 1748, chapter 6,
sections 2, 5 and 24; Acts 1753, chapter 1, sections 2, 5 and
25; Acts 1748, chapter 4, section 5; chapter 9, section 1;
Acts 1705, chapter 6, section 1.

The Constitution of 1776 neither created any court, nor
prescribed or limited its jurisdiction. It recognized the
potential existence of the supreme court of appeals, and
general court, judges in chancery, judges in admiralty by
providing for the election of judges thereof, and fixing the
tenure of their offices during good behavior; and by article
15, it in like manner recognized the existence of justices of
the peace by providing for their appointment. It contained
no provision prescribing or limiting the jurisdiction of any of
said courts, save only that by section 16 it provided that cer-
tain impeachments should be tried in the general courts, and
that impeachment of judges of the general court should be
tried in the court of appeals. In all other respects the
jurisdiction of each of said courts, remained to be prescribed
and limited, according to law. To none of these courts was
any other constitutional jurisdiction granted than for the
trial of impeachments. The court of appeals was first
established by chapter 22 of the Acts of the General Assem-
bly, passed in May, 1779, and was composed of the judges of
the high court of chancery, of the general court, and of the
court of admiralty, and their jurisdiction was therein pre-
scribed. The high court of chancery was established by
chapter 15 of the Acts of the General Assembly, passed in
October, 1777, and its jurisdiction was defined as a court of
general chancery jurisdiction. By chapter 17 of said Acts,
passed in October, 1777, the General Assembly established a
court of common-law with general jurisdiction in all matters,
civil and criminal, called the general court, and prescribed
its jurisdiction. By chapter 67 of the Acts of the General
Assembly, passed in January, 1788, district courts were
established as courts of general common-law jurisdiction in
all matters, civil and criminal, and their jurisdiction pre-
scribed and limited. These district courts were in their turn

superseded by the circuit court in 1809, established by acts
of the General Assembly, prescribing their jurisdiction.  By
chapter 69 of Revised Code of 1819 the several acts concern-
ing the establishment, jurisdiction and powers of the superior
courts of law were reduced into one act, establishing *fifteen*
circuit courts, which again prescribed and limited their juris-
diction; and these circuit courts with the jurisdiction so con-
ferred, existed when the case of the *Commonwealth* v. *Dan-
dridge* arose and was determined.  The general court, at
that time was composed of all the judges of the circuit
courts, and its jurisdiction was likewise prescribed and
limited by chapter 67 of the Revised Code of 1819.  As
the jurisdiction possessed by the circuit courts at the time
the case of Dandridge was decided, was purely statutory,
derived from the Acts of the General Assembly, and not
from a constitutional grant of authority, Judge Parker in
delivering his opinion in that case could with propriety say,
"it may be thought by some who admit the necessity of im-
mediately punishing certain kinds of contempt that it would
be better to transfer the power to some other tribunal than
the court especially where it consisted in personal disrespect
to the judge.  This is a subject for legislative, not for judi-
cial investigation.  At present, the power belongs to the
court, which has no authority even to empannel a jury, forth-
with to try the facts, if it thought such a step desirable.  And
it will probably be found that it cannot be lodged in safer
hands."  By the amended Constitution of Virginia adopted
in April, 1830, section 1 of article 5, it is declared that the
"judicial power shall be vested in a supreme court of appeals,
in such superior courts as the Legislature may establish and
the judges thereof, in the county courts, and in justices of
the peace.  The Legislature may also vest such jurisdiction
as may be necessary in corporation courts, and in the magis-
trates who may belong to the corporate body.  The juris-
diction of these tribunals and of the judges thereof shall be
regulated by law."  The General Assembly at its first ses-
sion after the adoption of this amended Constitution, passed
an act on April 16, 1831, establishing in each county of the
commonwealth a "circuit superior court of law and chan-
cery," prescribed its jurisdiction and defined and limited its

powers.  As we have already seen, this was clearly within the power of the General Assembly under the provisions of said amended Constitution.  By section 25 of that act, which is in substance the same as is contained in sections 24, 25, 26 and 27 of chapter 194 of the Virginia Code of 1849, which has been re-enacted in sections 27, 28, 29 and 30 of chapter 147, Code W. Va., the General Assembly for the first time undertook to define contempts and to limit the power of the courts to summarily punish the same.  It must be borne in mind that when this provision was enacted by the General Assembly of Virginia, it was fully warranted by the amended Constitution of 1830, in limiting the powers of all the courts not created by the Constitution itself, for as we have already seen, it expressly provided that the jurisdiction of the judges and of the courts created by the Legislature under and by virtue of section 1 of article 5 thereof, shall be regulated by law.  Under the ample power thus conferred upon the General Assembly it possessed the constitutional power to deprive all superior courts created by it, and the judges thereof of all power to punish summarily any contempt whatever.  When therefore the case of the *Commonwealth* v. *Deskins,* was decided by the general court in 1834, it was controlled by said section 25 of chapter 11 of of the Acts of 1831, which defined contempts and limited the power of the court to punish the same summarily. When the Code of 1849 went into effect on the 1st day of July, 1850, the amended Constitution of 1830 was in full force, and so continued until January, 1852, when it was superseded by the amended Constitution, which was adopted on the 1st day of August, 1851.  By section 1 of article 5 of the Constitution of 1851, it was provided "there shall be a supreme court of appeals, district courts and circuit courts. The jurisdiction of these tribunals, and of the judges thereof except so far as the same is conferred by this Constitution shall be regulated by law," but it wholly fails to prescribe the jurisdiction of any court except that of the supreme court of appeals, thus leaving the jurisdiction of all other tribunals to be regulated by law.  The supreme court of appeals was created and existed by section 1 of article 5 of the amended Constitution of 1851, and not by statute, nevertheless, sec-

tions 24, 25, 26 and 27 of the Code of 1849, were continued in the edition thereof published in 1860, and thence found its way into chapter 147 of the Code of West Virginia, although the same, so far it could be applicable to the Supreme Court of Appeals, was inconsistent with the amended Constitution of 1851.

The argument therefore of the respondent's counsel in favor of the constitutionality of sections 27, 28, 29 and 30 of chapter 147 of the Code of West Virginia derived from the decision of the general court of Virginia in the case of the *Commonwealth* v. *Deskins, &c.,* falls to the ground, for it does not follow that if that statute was constitutional in Virginia, where her courts were created and existed, and the jurisdiction thereof conferred by statute, that the same is constitutional in this State where the courts are created and their jurisdiction is conferred by constitutional provision and not by statute.

That statute which has been handed down and is now found in our Code, under the changed condition of the State government might be considered constitutional now as to the circuit court, for under the principle before announced, it might be deemed a mere regulation of the power of courts to punish as for contempt, as it leaves power to the circuit courts by indictments under their own supervision to punish as for constructive contempts of the character which we are considering. Whether such power under the Code is sufficient for the protection of said courts, we will not now determine, leaving that question to be decided when occasion may require. Neither is it necessary to decide whether the Legislature can limit the power of this Court to punish for constructive contempts, as it is evident to us it has not attempted to do so. We would not upon settled principles decide an act of the Legislature unconstitutional if by any construction it could be made consistent with the Constitution. The whole scope of the statute shows clearly that it was intended to apply to inferior courts and not to the Supreme Court of Appeals. Section 28 provides for the punishment of direct contempts without a jury by a fine not exceeding fifty dollars, and imprisonment not more than ten days. "But" (it further provides) "in any such case the

court may impanel a jury (without an indictment or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict." This Court cannot impanel a jury. It has no machinery to carry out the requirements of the statute, and therefore it is clear to us that the Legislature did not intend the statute to apply to this Court. This Court then has the unrestricted power, uncontrolled and unregulated by statute to punish for direct or constructive contempt by fine or imprisonment or both.

Is the publication complained of here a contempt of this Court? It seems to us that the books do not furnish a clearer case of contempt. It is a contempt, because it charges three of the judges of this Court, acting in their judicial capacity, with an offence, which, if true, is just ground of impeachment; with an offence calculated to degrade the Court and destroy all confidence of the people therein. If to charge three of the judges of this Court with having attended a political caucus and advised a certain action by the same, coupled with the promise, that as a Court they would sustain the action of the caucus, and then in pursuance of that pledge made more than a year ago, the same judges as a Court were about to decide the case then before them as the caucus desired, is not a contempt of the Court, then it seems to us, that nothing would constitute a contempt. If to charge a court, or a majority of its members with having prostituted their high and sacred trust to base political purposes is not a contempt, then we may truly say that such a thing does not exist. The article on its face shows, more-over, that it was intended to influence the decision of the Court in the cause, to which reference is therein made, and which was then pending, or to prevent the Court from deciding it at the present term. That it had no such effect, is not material, so far as the contempt is concerned. It first says: "The campaign is shaping itself. It leaks out that the Supreme Court of Appeals is to be brought to the rescue in a *decision affirming* the unconstitutionality of the exemption act, and declaring the supplemental assessment order to be lawful and right. This is in effect what was promised by the three Supreme Court judges to the Democratic caucus

before the order was issued." Again: "Three out of four judges of the Supreme Court told the Democratic caucus more than a year ago to go ahead and rely on the backing of the Court." This is a charge of infamy against the Court. But it is further charged, that the decision would be hastened by the Court, against the interests of one of the candidates for nomination for Governor. Thus again charging the Court with using its power for political purposes. / Then comes the clause, the manifest intent of which was to compel the Court to decide against its supposed convictions or not now decide at all, and charging it with being capable of deciding a cause not from its convictions, but as convenience or political desires might dictate. It says: "Of course it was not intended that the *purpose* of the Court should be made public, and *publicity* may induce the Court to change its mind just to show that somebody has been taking liberties with the text and misrepresenting the Court. We shall see what we shall see."

In every aspect of the case the publication is clearly a contempt of this Court. Can such a publication be palliated or excused? Far be it from us to take away the liberty of the press, or in the slightest degree to interfere with its rights. The good of society and of government demands, that the largest liberty should be accorded the press, which is a power and an engine of great good; but the press itself will not for a moment tolerate such licentiousness as is exhibited in said editorial. The press is interested in the purity of the courts, and if it had no respect for the judges on the bench, it should respect the Court; for when the judges now on the bench shall be remembered only in the decisions they have rendered, the Court will still remain, it never dies; it is the people's Court and the press as the champion of the people's rights, is interested in preserving the respect due to the Court.

Have the defendants purged themselves of the contempt? The defendant, Frew, disclaims all knowledge of the pendency of the suit or that the article was published until he read it in the paper. We think he cannot be entirely acquitted, but that he should suffer a light punishment. He should not allow the paper, of which he is the publisher, to

indulge in such libelous editorials. The defendant, Hart, stands on different ground. His answer is an aggravation of his contempt. He does not express the slightest regret for his act, nor does he exhibit a particle of regard for good order nor indicate in any degree appreciation of those great principles that lie at the foundation of good government. By his answer he seems to regard the highest court of the State as a proper subject of libel, provided he can by such libelous publication gain a political advantage. He seems to forget that it is the Court of the whole people, and can only have their respect as long as it holds their confidence. So far from expressing any regret, he attempts to justify himself by another publication in another paper, which will be found in the statement of the case, and which publication he says led him to believe the charge was true, and he felt it was his duty to publish it. And he says if this article is libelous so is that; and farther, that one of the judges of this Court was an intimate friend of the editor of the other paper, living in the same town, and the Court had not denied the truth of *that* statement. The Court had not denied it? The Court does not deny any charge made in the papers in reference to it. It can deny a libelous charge in only one way, and that it has done in this instance, in the only way in which it ever denies such a charge. Besides it is very apparent that this article published on June 18, is very different from that which purports to have been taken from the *Greenbrier Independent,* as appears by the paper filed with the answer. It is not even charged that the *Greenbrier Independent* said: "Three of the judges attended a Democratic caucus, advised its action, and promised as a Court to back it," and that "the Court was now about to keep its promise." The Court, whose duty it is to guard the public interests in such matters, might have been justified in forbearing to issue the rule in the one case when it would not be in the other. The answer is a very reckless one. And the defendant after all that swears, that "in its publication there was no intention to commit or express a contempt of the Court, and no such feeling was entertained by the then publishers and editors of the *Intelligencer.*"

The fact that the respondent in his answer disclaims any

intention to commit or express a contempt for the Court, will not be accepted as a reason for discharging the rule. The meaning and intent of the respondent must be determined by a fair interpretation of the language used by him in the objectionable article. *People* v. *Wilson*, 64 Ill. 195; *Hughes* v. *People*, 5 Col. 436; *Woolley's Case*, 11 Bush 95; *Henry* v. *Ellis*, 49 Ia. 205.

As a further excuse he says the Court announced at the time the alternative writ issued in the *mandamus* case, that the respondent must be ready to proceed with the case on the return day, and directed the clerk to so inform the respondent; and that he did not at the time the article was published know that the law required the assessor's books to be returned before the first of July. He must have known when the article was published, that the Court had given the respondent six days for preparation after the return day of the writ. He says the Court did not announce its reason for the necessity of having the case decided with despatch. This all shows how ready the defendant was to do the Court injustice. If he had proper respect for courts, he would presume they had good reasons for their judicial action, and that it might not be necessary at all times to give those reasons.

There is nothing in said Hart's answer to palliate his offence, but it is aggravated instead. This is a case in which the court would be justified in both fining and imprisoning C. B. Hart. The contempt is of the most aggravated character. The books fail to show one that is any more so. But a majority of the Court is of opinion, that the ends of public justice will be attained in this case by the imposition of a fine. For more than a century so far as I know, but one case of constructive contempt is found in the Virginia reports, and none in this State until now; and it is sincerely hoped that another centennial will arrive before the necessity for punishing for such a contempt will again arise. As this is the first case of this character in this State, we dislike to be severe. We would gladly discharge the rule, if we could. It never would have issued, had we dared consult our feelings in the matter. It is the unanimous judgment of the Court, that an attachment issue against John Frew and C. B. Hart, returnable forthwith.

SNYDER, JUDGE, concurring:

As the questions presented by this case are not only of great importance but of much delicacy, it may be, perhaps, more satisfactory both to myself and to others that I should briefly state, at least, some of the reasons which lead me to the conclusions on which the Court founds its judgment.

Before entering upon the merits it may be proper to notice the objections made by the respondents to the rule awarded against them. They assert that the rule was improvidently awarded because:

*First*—It was not entered upon a complaint or other information supported by affidavit; and *second*, It was not set forth either in the rule or in the communication upon which it, at least in part, purports to be based, that respondents were, at the time of the publication of the article complained of, editors, proprietors and publishers of the *Intelligencer*, or in any manner connected therewith.

While the rule does not, in terms, state that respondents were the proprietors and publishers of the *Intelligencer* on the day the article complained of appeared in that paper, it does set forth the article in full and calls upon them to appear and show cause, " why they and each of them shall not be attached for their contempt of this Court in publishing said article." This plainly and explicitly notified them of the very cause and nature of the offence and by the strongest implication informed them that they were the persons charged with its commission.

The proceedure in cases of this character is various in different jurisdictions and the discretion of the presiding judge is so broad even in inferior courts that it will seldom be revised by the appellate court—*Androscoggin R. R. Co.* v. *Androscoggin*, 49 Me. 392; *Bates' Case*, 55 N. II. 326.

In *Dandridge's Case*, 2 Va. Cas. 408, decided in 1824, the general court, after a very full and able review of the law on the subject, both upon reason and authority, decided that, "an attachment for contempt has no other object than to bring the party into court. When the contempt is in open court, the party being present, there is no need of any process to bring him in, nor any need of interrogatories to ascertain what has occurred in open court.

" When the contempt is not in open court, the usual course is to issue a rule to show cause why an attachment should not issue, though the attachment sometimes issues without the rule. If the party appear to the rule to show cause, and instead of moving to discharge it, submit to answer interrogatories, there is no necessity for the attachment." The court also held that if, before the rule issued the party appeared in court and a rule was made upon him to show cause and he was recognized to appear on the next day, " the rule for an attachment, as well as the attachment itself, may be dispensed with."

The contempt in that case was committed in the presence of the judge, on the court-house steps, just as he was going upon the bench to open court; but the court not being then actually in session, it was held to be not a direct but a *constructive* contempt. The proceedings in the case against the defendant were instituted by the court without either rule or attachment. The defendant being in court, the judge made a statement of the facts constituting the contempt which was read in open court and the evidence of sundry witnesses as to the facts was also taken in open court and sworn to in the presence of the defendant. The evidence having been thus taken, on the motion of the attorney for the commonwealth and of the defendant the cause was continued until the next day and the defendant directed to show cause on that day "why he should not be committed or fined for his said contempt." These were all the proceedings had in that case either to inform the defendant of the charge or to bring him before the court and the general court held them to be sufficient.

In *Moore's Case*, 63 N. C. 397, the court entered an order stating, that "the court being informed of a certain libelous publication directly tending to impair the respect due to the authority of the court," &c. Upon this order proceedings by rule for a contempt were taken against the persons who had signed said publication. It does not appear how the court became informed of said publication. The defendant appeared and protested in his answer that the rule "ought not to have been made in his absence, without notice, and without affidavit or other legal proof of the facts upon which

said rule is based." In regard to this protest, Pearson, C. J., in delivering the opinion of the court, says: "The objection that the rule was made without affidavit or other legal proof of the facts upon which it is based, is equally untenable. It is admitted that when the proof is furnished by the senses of the judges, it may be acted on. Here there is such proof. We know by our senses that a newspaper containing the paper referred to, purporting to be signed by Moore and others had been extensively circulated and was then in the court-room; and the want of a disavowal on his part, that he had signed the paper, or consented to its publication, furnished *prima facie* proof, not sufficient for *final* action, but all sufficient as a ground for the rule. On his appearance he was at liberty to deny the fact without an oath and the denial, like the plea of 'not guilty,' would simply have put the fact in issue, and he would have been entitled to have the rule discharged, unless the fact was proved by *direct testimony*. Instead of that, he *admits* the fact. So this is no legitimate ground of complaint. In short, all the preliminary objections were waived, and the reference to them can answer no useful purpose." 63 N. C. 404.

Many other authorities might be produced to show that the judges may, not only in cases of contempt in the face of the court but in cases of constructive contempt, upon their own motion and without affidavit or other sworn statement, award rules against the offenders. In direct contempts it is almost uniformly the practice for the judge to act on his own information. He acts upon the evidence of his own senses. And in the case of constructive contempts, if he has the same kind of evidence, he is equally at liberty to act upon it. In some cases the character of the offence may be more complicated and less susceptible of furnishing such proofs of its existence as will authorize the court to act upon it. In such cases a sworn statement is necessary and should always be required as the foundation of the rule. But a publication in a newspaper is not of that class, and especially is such the case when the publication charged as the contempt is an editorial article in a newspaper published in the very city or town in which the court is at the time being held. Such a publication furnishes not only the evidence of its character

but the paper in which it is published furnishes the names of the publishers. Such was the nature of the offence charged in this case, and the rule might with entire propriety, and no doubt would, have been awarded by the Court on its information had not its action been anticipated by the counsel in the case to which the objectionable publication had reference.

The introduction by the defendants of the communication of Mr. Russell in reference to what occurred between him and the President of this Court, in view of the precedents and the law in proceedings of this character, was gratuitous and irrelevant and could not possibly subserve any useful purpose. It was plainly the right, if not the positive duty, of the President of the Court, or any member with the assent of the others, to institute proceedings for contempt, and *a fortiori,* the President had the clear right to confer with the counsel who was about to call the attention of the Court to the facts requiring such proceedings. While said communication was thus unnecessarily and improperly brought before the Court, I do not wish to be understood as impugning the motives of counsel in permitting it to be done, as they doubtless regarded it material.

In *The State v. Morrill,* 16 Ark. 384, the rule was issued on the unsworn statement of a member of the bar and in all respects the proceedings in that case were followed in the one at bar. But if there could be any question about the legality and sufficiency of the rule in this case, the respondents by submitting to answer and *admitting the facts* necessary to support the attachment, thereby waived all preliminary objections. It would certainly have been utterly useless if not absurd for the Court, after the respondents had fully answered and *admitted* all the facts to make out the offence, to award a rule, as it could have done at once, requiring them to admit the facts a second time. Under the circumstances I am clearly of opinion, that the objections to the rule and mode of proceedure are plainly untenable.

After the party is before the Court the proceedinggs are to be regarded and entitled as of a criminal character—*State* v. *Harper's Ferry Bridge Co.,* 16 W. Va. 865; *Ruhl* v. *Ruhl, supra* 279. And where the offence is of a grave nature, it evidence beyond the examination or answer of the defendant

is gone into, I apprehend only such evidence should, in general, be received as would be admissible on the trial of an indictment for the same grade of offence. Indeed, there seems to be no reason why the general course of the trial before the court should not conform in substantial respects to the trial of an indictment before a jury, and be governed by the same rules; but the mode of proceedure must be left, to a considerable extent, to the discretion of the court, though this discretion is not by any means unlimited—*Bates's Case*, 55 N. H. 355; *State* v. *Matthews*, 37 *Id.* 454.

Upon the merits of this case it may be stated as a proposition of law unquestioned and unquestionable, that by the common-law of England as well as by the uniform decisions of the courts of this country, courts have the inherent power to punish for contempts in a summary manner, and that this power is an essential element and part of the court itself which cannot be taken away without impairing the usefulness of the court, because it is a power necessary to the exercise of all others. This much has never been disputed. But there has been in the past and still is much difference of opinion as to the character of contempts to which this doctrine applies, and as to the right of the Legislature to limit this power in courts created by written Constitutions. I do not propose to consider these questions as they have been fully discussed in the opinion announced by the President of this Court.

Apart from any statutory enactment, I regard it as the settled law of Virginia and this State, fully established by the able opinions and the decision of the general court of Virginia in *Dandridge's Case*, 2 Va. Cas. 408, that the courts of these States possess the power to punish, in a summary manner, both *direct* and *constructive* contempts. The right to do so in cases of the first class no one denies. In respect to the other class, constructive contempts, I think, the right is fully established by the case just cited. That was a case of constructive contempt, so held to be by the court. The court, after quoting from Blackstone's Com., to show that contempts "are either *direct*, which openly insult or resist the powers of courts, or *the persons of the judges who preside*," and that among the latter are those which consist "in speaking or writing con-

temptuously of the court or judges acting in their judicial capacity," says: "Nor in this particular, and for this end, is it of the least importance whether the contumely is used *in open court*, at the moment when the occasion occurs *or the moment afterwards* when the crier has proclaimed the adjournment, as the judge descends the steps of the bench, or those of the court-house door. The only real question in either case is, *whether it is his official conduct for which he is challenged or insulted.*"—*Id.* 419. And in summing up the kind of contempts that may be summarily punished by fine and imprisonment Judge White, on page 435, says: "That these contempts to courts, so punishable, may be committed either in the *face of the court*, or in the absence of the party (that is, the court) so insulted. That those contempts which may be committed in the *absence* of the party, for reasons which I need not now detail, may, among other things, be committed by *speaking* or *writing* contemptuously of the court, or judges acting in their judicial capacity, or by saying or writing anything which is calculated to prejudice the public mind respecting any suit then pending in court." "But authorities are introduced," says the judge, "which prove that a court may fine and imprison for a contempt committed in its face, and cases to prove that this has often been done; and what then? Does this show that a court cannot commit for like offences perpetrated out of court? Do not Hawkins and Blackstone both declare, *first*, that a court may commit for contempts in its presence, and having disposed of *that point*, proceed to state, that it may also fine and imprison for contempts committed in its *absence*, and state what those latter contempts are, and show how in such case the court must proceed?" Among these latter contempts are embraced, "saying *or writing* anything which is *calculated* to prejudice the public mind respecting any suit depending in court." The decision of the court was in accordance with the views thus expressed and grounds here taken.

This decision was made in 1824, by a unanimous court composed of some of the most eminent and conservative judges that ever adorned the bench of Virginia. I think, therefore, it may be safely stated, that this decision declares the law of Virginia as it existed in 1824, and as no subse-

quent decision has overruled or even questioned the law as thus declared, it necessarily follows that this must be held and taken to be the law of Virginia and of this State at the present time except so far as it has been modified or changed by statute. What is the character and extent of the legislation on the subject?

On April 16, 1831, the General Assembly of Virginia passed an act which was amended by chapter 24 section 1, Acts 1847–8, and was subsequently incorporated in the Codes of that and of this State. The provisions of said statute are substantially the same in each of the acts referred to and as they are now in our Code, chapter 147. Section 27 of said chapter provides that, "the courts and judges thereof may issue attachments for contempts, and punish them summarily, *only* in the cases following:" (Here it mentions four classes of contempts all of which are either *direct* or in relation to the officers and process of courts). Sections 28 and 30 are as follows:

" 28. No court shall without a jury, for any such contempt as is mentioned in the first class embraced in the preceding section, impose a fine exceeding fifty dollars or imprison for more than ten days. But in any such case the court may impanel a jury (without an indictment or formal pleading) to ascertain the fine and imprisonment proper to be inflicted, and may give judgment according to the verdict."

" 30. If any person by threats or force, attempt to intimidate or impede a judge, justice, juror, witness, or an officer of a court, in the discharge of his duty, or to obstruct or impede the administration of justice in any court, he shall be prosecuted as for a misdemeanor, and punished by fine and imprisonment, or either, at the discretion of a jury."

To hold that this statute applies to the Supreme Court of Appeals of this State would be, in effect, to deprive that court of the right to punish summarily any *constructive* contempts of any kind whatever. It has no jurisdiction or machinery to try misdemeanors and the statute declares that such contempts shall be prosecuted in no other manner. As we have seen, by the common law of the State this Court had the power to punish such contempts. This was declared to be one of the inherent and necessary powers of the court. This

statute then, if it be construed to apply to this Court, would be an aboslute denial of its power to punish such contempts and not a regulation or limitation of the right or of the mode and manner of the punishment. This being one of the inherent powers of the court conferred by the Constitution which created the court, the Legislature, while it might regulate, has not the power to destroy it, and, therefore, to so construe the statute would bring it in conflict with the Constitution and make it void. *The State* v. *Morrill,* 16 Ark. 384; *In re Woolley,* 11 Bush 95. But such an interpretation is not to be entertained unless it is unavoidable and the legislative intent is so plain as to be capable of no other construction. It does not seem to me that such was the legislative intent. The statute provides that in one of the named classes of contempts and, perhaps, the most important one, the court shall not impose a fine exceeding fifty dollars or imprison more than ten days. But in such case *the court* may impanel a jury and they by their verdict may find and the court impose indefinite fine and imprisonment. *The court* here cannot refer to a court which has not the right or the means of impaneling a jury. One court cannot punish a contempt as such committed against another court. And the consequence is that if this statute embraces the Appellate Court, then that Court being without the adjunct of a jury can in no case impose a fine exceeding fifty dollars or imprison more than ten days while the inferior courts of the lowest grade by the aid of their juries may impose fines and imprisonment without legislative limit. Such, it seems to me, was not the intent of the Legislature—certainly the intent to that effect is not manifested so plainly as to admit of no other reasonable and fair interpretation.

In the class of constructive contempts mentioned in section 30, the punishment of which in any manner is, as we have shown, absolutely denied to the Appellate Court, the inferior courts still have under the statute an efficient means of punishing. They have the right at any time to call before them both grand and petit juries and under the statute they may with but little delay—almost as summarily as before the statute—punish such contempts. The statute as to such courts may well be regarded as a regulation and, perhaps, a

necessary and proper limitation—*Deskins's Case*, 4 Leigh 685; *Ex parte Robinson*, 19 Wall. 505.    But this is very different in regard to the Appellate Court.    It is deprived of all power to punish such contempts in any manner as contempts or otherwise.    In this respect it has no more control or power than a private citizen who may be libeled or assaulted—it must assume the role of a private prosecutor before a court over which it has no control.    My conclusion is, therefore, that said statute has no application to this Court and leaves its jurisdiction and power to summarily punish *constructive* as well as direct contempts according to the principles of the common-law as declared and defined in *Dandridge's Case, supra.*

Having thus shown that this Court has the power to punish for contempts, it must not be overlooked that this power can be justified by necessity alone, and should rarely be exercised, and never, except when the necessity is plain and unmistakable.    It is not given for the private advantage of the judges who sit in the Court, but to preserve to them that respect and regard, of which courts cannot be deprived and maintain their usefulness.    It is given that the law may be administered fairly and impartially, uninterrupted by any influence which might affect the rights of the parties or bias the minds of the judges—that the Court may command that respect and sanctity so essential to make the law itself respected—and that the streams of justice may be kept pure and uncorrupted.    If the Court is scandalized and its motives or integrity impeached, in regard to official acts or conduct, the consequences cannot be otherwise than baneful.    The administration of the law is embarrassed and impeded, the passions often unconsciously roused, the rights of the parties endangered, and a calm and dispassionate discussion and investigation of causes prevented.

The public have a profound interest in the good name and fame of their courts of justice, and especially of the courts of last resort.    Everything that affects the well-being of organized society, the rights of property, and the life and liberty of the citizen is submitted to their final decision.    The confidence of the public in the judiciary should not be wantonly impaired.    It is all-important to the due and efficient

administration of justice that the courts of last resort should possess in a full measure the entire confidence of the people whose laws they administer. All good citizens will admit that he who wilfully and wantonly assails the courts by groundless accusations, and thereby weakens the public confidence in them, commits a great wrong not alone against the courts, but against the people of the State.

It must be and is cheerfully conceded that public journals have the right to criticise freely the acts of all public officers —executive, legislative and judicial. It is a constitutional privilege that even the Legislature cannot abridge. But such criticism should always be just and with a view to promote the public good. Where the conduct of a public officer is wilfully corrupt, no measure of condemnation can be too severe, but when the misconduct, apparent or real, may be simply an honest error of judgment the condemnation ought to be withheld or mingled with charity. As said by Holt in his work on Libel, chap. 9, "It is undoubtedly within the natural compass of the liberty of the press, to discuss in a decent and temperate manner, the decisions and judgments of a court of justice; to suggest even error; and provided it be done in the language and with the views of fair criticism, to censure what is apparently waong; but with this limitatation, that no false or dishonest motives be assigned to any party." These views are in my judgment sound and these rights should be cheerfully accorded to the press in this free and enlightened country.

I know full well that respect to courts or judges cannot be compelled; "respect is the voluntary tribute of the people to worth, virtue and intelligence, and while these are found on the judgment seat, so long and no longer will courts retain the public confidence." But the people have placed the judge in a position in which he unavoidably comes in conflict with the jealousies and resentments of those upon whose interest he has to act; his character, virtue and intelligence, however pure and unselfish, are not always a protection against the prejudices and passions of such as conceive themselves injured by his legitimate and proper official acts, and when assailed by such, if he may not punish them as a court, "he will be reduced to the alternative of either sub-

mitting tamely to contumely and insult, or to resenting it by force or resorting to the doubtful remedy of an action at law." "In such a state of things" as said by Judge Dade, in *Dandridge's Case,* "it would rest in the discretion of every party in court, to force the judge, either to shrink from his duty, or to incur the degradation of his authority, which must unavoidably result from the adoption of either of the above alternatives. To suppose that the personal character of the judge would be a sufficient guarrantee against this, is to imagine a state of society which would render the office of the judge wholly unnecessary."

The people, for the benefit of society and the promotion of law, order and justice, have placed the judge in a situation in which by reason of his office and duties as such, he is exposed to assaults and unjust suspicions which he would not have to incur as a private citizen. These assaults and suspicions do not attach to him as a citizen. It is against these that the power of the court should defend him, and not from those which attach to him as a private person merely. In this country there are and ought to be no privileges but such as exist for the public good. No privilege can be claimed or admitted for a judge except such as pertain to his official acts. Attacks upon these it is neither his duty nor his right as a private citizen to defend himself against. These are the acts of the people which they have imposed upon him, and it is their duty alone to defend or to give the judge the power as an officer to do so for them. Experience has shown that this is absolutely necessary and that its exercise cannot be withheld without destroying the efficiency and usefulness of courts. The judge as a private citizen is not entitled to redress his grievances except as other citizens; but his public acts are not of that character and cannot and ought not to be so defended.

While it cannot be successfully, as I think, denied, that this protective power, this right of self-defence exists as a necessity and must be exercised by some officer, it must be conceded that it is undefined and to a large extent arbitrary and would, therefore, seem to be, abstractly considered, liable to abuse, if not dangerous, in the hands of the court which is itself the subject of the offence. But in reply, we

may, with just pride, refer to the history of the jurisprudence of Virginia and this State to prove this power is not likely to be abused and that it could not be entrusted into safer hands than the Supreme Courts of these States. The reports of Virginia, covering more than a century, show but one case of this character and this is the first that has occurred in this Court or any circuit court of this State, so far as I know. This creditable fact in our history does honor not only to the courts, but to the press and people of these States.

I concur in the syllabus and judgment of the Court. In respect to the character and evident purpose of the editorial article complained of, I concur with the opinion announced by the President of the Court.

GREEN, JUDGE:

The members of this Court are well agreed as to the law applicable in this case and also as to the propriety of permitting this proceeding to abate as to A. W. Campbell, one of the proprietors of the *Wheeling Intelligencer*, it appearing that he has been absent from the State for some ten months and was necessarily ignorant of the matters, on which the rule for contempt in this case was issued, and had practically no supervision of the *Wheeling Intelligencer*, when the editorial complained of was inserted. We are also agreed as to the punishment, which should be inflicted on John Frew. But I differ from the other judges as to the character of the punishment, which should be inflicted on C. B. Hart, the chief editor of said paper, and the author of the obnoxious editorial, which appeared in the paper of June 18, 1884. This editorial was as follows: "The State campaign seems to be shaping itself. It leaks out that the Supreme Court of Appeals is to brought to the rescue in a decision affirming the unconstitutionality of the exemption act and declaring the assessment order to be lawful and right. This is in effect what was promised by the Supreme Court judges to the Democratic caucus before the order was issued.

"It might be thought strange that anybody could know what the decision of the Supreme Court is to be on any question. But it seemed equally strange that three out of four

judges of the Supreme Court told the Democratic caucus more than a year ago to go ahead and rely on the backing of the Court. The present understanding is that the decision is to be rendered before the meeting of the Democratic State convention in order to simplify the situation. It is also understood that this move is not intended to advance the interest of Hon. E. Boyd Faulkner.

"Of course it was not intended that the purpose of the Court should be made public, and publicity may induce the Court to change its mind just to show that somebody has been taking liberties with the text and misrepresenting the Court. We shall see what we shall see."

The Democratic caucus referred to in this editorial appears in the answer of C. B. Hart, the chief editor of this newspaper, to have been a conference of leading Democratic members of the Legislature including the chairman of both the Senate and House finance committees, called together by the Governor during the session of the Legislature of 1883, to consider whether the statute-law should not be made to conform to the decision of this Court in the *Chesapeake & Ohio Railway* v. *The Auditor, &c.*, 19 W. Va. 408, as interpreted by the Governor. It also appears from this answer, that the expected decision of this Court referred to in this editorial was to be rendered in the *mandamus* case of *Joseph S. Miller, Auditor,* v. *T. H. Buchanan,* assessor of Brooke county, then pending in this Court and decided on the day the rule in this case was returnable, June 28, 1884, reported *supra,* and which is referred to for a full understanding of that case.

Hart in his answer justified the publication of June 18, 1884, complained of, so far as the two first paragraphs in it are concerned, because of a publication which he says appeared in the *Greenbrier Independent* some time prior to August 31, 1883. This publication in the *Greenbrier Independent* I never saw and never heard of till these proceedings for contempt were instituted; and I know now nothing whatever about it except what is stated in the *Wheeling Daily Intelligencer* of August 31, 1883, which was filed with his answer by Hart. Nor did I ever see or hear of the editorial in that number of the *Wheeling Intelligencer* till the filing of this answer of Hart, which editorial is a comment on this

publication in the *Greenbrier Independent*. This number of
the *Wheeling Intelligencer* does not purport to give the whole
of the publication in the *Greenbrier Independent*, as I under-
stand it; and what it does give it does not purport to give in
the words of the publication in the *Greenbrier Independent*, as
I understand it, though perhaps in this I may be mistaken.
Nor does he file with his answer a copy of this *Greenbrier
Independent* or of this publication in it.   And as the editorial
in the *Wheeling Intelligencer* of August 31, 1883, based on
what he says was said in the *Greenbrier Independent* is very
uncharitable and partisan, I cannot but deem this editor a
very unreliable person to extract fairly the substance of a
publication of a political opponent.   I can therefore have no
assurance that this statement in the *Daily Wheeling Intelligencer*
of August 31, 1883, fairly represents the meaning of the
language in the publication of the *Greenbrier Independent*.
It may be, if this publication of the *Greenbrier Independent*
was before us, it might when charitably and fairly interpreted
consist with a state of facts of the following general char-
acter:   That after the letter of Governor Jackson was written
to the Auditor and after he had written his circular to his
assessors known as the supplemental assessment order, both
of which were written without consultation with, or knowl-
edge on the part of the judges that anything of this sort was
contemplated, the Auditor or some other person may have
asked members of this Court what they thought of it in some
casual conversation, and the judge or judges may have said
they thought it all right, for in so saying under such circum-
stances, he or they would have done nothing objectionable.
And if any such thing ever occurred, no doubt such judge or
judges who might have so expressed himself or themselves,
would in a very brief time have no recollection of such casual
conversation or of what was said in it.   The whole conversation
would pass from his or their mind as a thousand other casual
conversations, in which he or they took no special interest,
have passed from his or their mind.   There would be nothing
to impress on the mind of such judge or judges such a conver-
sation, for it is supposed to have occurred when this circular
known as the supplemental assessment order was first issued
by the Auditor, and of course there had been no indication that

this instruction of the Auditor would not be cheerfully obeyed by the assessors. There never had been an instance in this State or in Virginia, so far as I ever heard of, in which any assessor had refused to obey any instruction of the Auditor, and I presume neither the Auditor nor the judge or judges, who may have been thus casually conversed with, nor any one else ever expected any litigation to arise from a refusal of any of his assessors to obey his instructions.

It is possible of course that the *Greenbrier Independent* may have endeavored to make more out of such casual observa-- tion of one or more of the judges than he ought to have done, and represented it in his publication as a deliberate opinion of these judges. If so, he did very wrong; or it may be possible he used the language contained in the *Wheeling Daily Intelligencer* of August 31, 1883. And as this may have been the case, I will give to the defendant, Hart, the full benefit of considering that the editorial in the *Wheeling Intelligencer* of August 31, 1883, has given fully and accurately what had been previously published in the *Greenbrier Independent*; and I will receive and treat as true what Hart states in his answer, that he had good reason to believe and did believe it to be true. This I will do, although he does say in his uncharitable commentary on this publication, as he calls it, of the *Greenbrier Independent*, when he first published it: "Perhaps there is no truth whatever in the report of this disgraceful proceeding." He claims now however in his answer that he believed it, when he published the editorial in his paper of June 18, 1884, and that he had good right to believe at least that the publication as it appeared in the *Greenbrier Independent* was true.

Admitting that he believed it to be true in the form in which it was re-published in his paper of August 31, 1883, did it justify, as he claims, the first two paragraphs of his editorial of June 18, 1884; or does it in any degree palliate his offence in the publication of this outrageous libel on three members of this Court? He does not state, who are the three members intended; and we have no idea to which of the members of our Court he intended to refer. In this editorial of June 1, 1884, he states in substance as a fact, that three of the four judges of the Supreme Court attended a

Democratic caucus more than a year ago, a caucus insinuated to have been a secret one, and that these three judges told this caucus to go ahead and have the supplemental assessment order issued by the Auditor, and that they might rely upon the Supreme Court of Appeals, if a controversy should arise about it, to decide that the exemption act was unconstitutional, and that the supplementary assessment order, which the caucus was to get the Auditor to issue to his assessors, was lawful and right. This is the plain meaning intended to be conveyed in the first two paragraphs of this editorial complained of. And the answer of the defendant Hart admits that he had no ground for this base and scandalous libel except this publication in the *Greenbrier Independent* nearly a year before. Yet in his editorial commentary on this publication of the *Greenbrier Independent* he distinctly admits, that he does not understand from it, that three judges of our Court ever attended this Democratic caucus. Indeed with the article before him, even as it is represented by the *Wheeling Intelligencer*, no one could possibly imagine that the three judges attended such caucus. But though by his own confession in his former editorial he knew this was not stated in the *Greenbrier Independent*, yet he published it as a fact and makes no reference to the publication of the *Greenbrier Independent* as the source of his information. Had he stated that these were conclusions, which he had drawn from this publication, even though he failed to republish it, his editorial of June 18, 1884, which would have been outrageously scandalous, if it had been confined to the first two paragraphs, might have been passed over as unworthy of notice. It would then have been understood that this scandalous matter was alleged not as a fact but stated simply as a deduction of a violent and partisan editor from a publication in another paper not given.

As a justification of the publication of the residue of this editorial of June 18, 1884, Hart says in his answer, that, when he made this publication, he knew that Joseph S. Miller, the Auditor, and the plaintiff in the *mandamus* case, had been a candidate for Governor at the hands of a Democratic State convention called to meet in Wheeling on the 23d day of July, 1884; and that on the 7th day of June,

1884, he wrote and published a letter declining to be such candidate, and soon after he instituted this *mandamus* suit against the assessor of Brooke, and an effort was made by his counsel to obtain an early decision of this *mandamus* case. The object of his desiring this early decision was, this answer says, understood among the friends of Miller to be that, if the decision should be favorable to him, he, Miller, might still go before the convention as a candidate for nomination for Governor with hopes of success. To prove this T. J. Parsons's affidavit is filed. This affidavit purports to state a conversation at a public hotel between two persons, who preferred Miller for Governor, and who supposed that, if he succeeded in the *mandamus* suit, he would still be a candidate for that office before the convention, and that this, one of them supposed, was the reason why he wanted an early decision of the case. The answer also states, that this Court publicly announced, when it awarded the writ of *mandamus*, that it would expect the case to be argued on the return day of the writ, which was only six days after its issue. And that the clerk of our Court at the instance of the Court wrote a letter to the defendant, Buchanan, informing him that he must be then prepared to go on with the case on the return day of the writ. But he says he did not then know, that the provision of law required the assessor to complete his book by July 1, and while this might have been the reason for the trying of the case speedily, this was not stated by the Court in the public announcement nor by the clerk in his letter to the assessor.

Is this either a justification or an excuse for a publication, which says: "It leaks out, that the Supreme Court of Appeals is to be brought to the rescue. * * * The present understanding is that the decision (one in favor of the Auditor) is to be rendered before the meeting of the Democratic State convention in order to simplify the situation. * * * * Of course it was not intended that the purpose of the Court should be made public, and publicity may induce the Court to change its mind just to show that somebody has been taking liberties with the text and misrepresenting the Court. We shall see what we shall see." I will state the reasons, which operated on the Court in fixing as early a day

for the disposal of this *mandamus* case, as it reasonably could. In the first place the law directs the assessors to return their books by July 1 in each year, and it was obviously desirable that a *mandamus* case asking that an assessor should be required to place certain property on his books should be decided before July 1. As it was, the case was decided on June 28; and the peremptory writ of *mandamus* was served on the last day of June. Thus the Court gave the utmost limit of time, which it could with any propriety have done. But the answer says that Hart was not aware, when he published this scandalous editorial, that the assessors' books were directed by law to be returned by July 1. But I presume he was aware that this Court at this term rarely ever sits much longer than July 4. And if he knew anything, he knew it was our duty to dispose of a case before us, in which the State had large interest, at some time during this term. This exceedingly suspicious defendant, Hart, is informed and believes that the announcement by this Court, when it awarded the *mandamus nisi*, that the parties must be prepared to go on with the argument on the return day of the writ six days from that time, was unusual; and this extraordinary announcement, as he thinks it, raised a suspicion in his mind, that there was a secret and clandestine understanding between the Court and the plaintiff in this proceeding. He was confirmed in this suspicion by the fact, that the clerk of this Court informed the defendant, the assessor of Brooke, that the Court had made this public announcement. I directed the clerk to write this letter. My sole object was to let the defendant know, that which had been publicly announced, because, as he lived in another county, I thought it possible he might not hear of this public announcement, he not being in Court and no one being there to represent him. I had this information given to him solely to indicate to him the importance of employing his counsel at once, in order that they might investigate the law of the case thoroughly and be prepared at the earliest period convenient to submit their views. I certainly had no thought that this act of our clerk or this public announcement of our purpose to dispose of the case, as promptly as it could be done, would give rise to a suspicion in the mind of any person, that our Court had

entered into some clandestine and corrupt agreement with the plaintiff in the proceedings. But when the defendant, Hart, learned that some friends of the plaintiff in this *mandamus* suit thought, that if the case was decided in favor of the Auditor, the plaintiff, before the meeting of a Democratic State convention on July 23, 1884, he might have a chance to get the nomination for Governor, he was convinced that there was an understanding with the Court, that a decision in favor of the Auditor, the plaintiff, was to be rendered before the meeting of this Democratic convention, and having no other reasons than these he felt himself justified in publishing this language: "It leaks out that the Supreme Court of Appeals is to be brought to the rescue. * * * The present understanding is that the decision (in favor of the Auditor) is to be rendered before the meeting of the Democratic State convention in order to simplify the situation. It is also understood that this move is not intended to advance the interests of Hon. E. Boyd Faulkner."

The reasons assigned by Hart in his answer stated above as a justification for this portion of his publication, strike me as not only ridiculous but as indicating a mind so blinded by prejudice and partisan bias as to render him a dangerous member of society. I cannot but regard the latter part of of this editorial quoted above as base and scandalous. There was nothing whatever in the proceedings in the *mandamus* suit peculiar or unusual. It was a case which, as every one knows, it was our duty if possible to decide during the present term, and that as it was a case of general public interest involving in the principles to be settled by its decision a large pecuniary interest, it was right and proper for the Court to give all the time it possibly could to its consideration, and with this end in view it was obviously proper to notify parties interested to prepare promptly to submit their views to the Court. This was done by the Court, and this it seems called forth this scandalous publication. I regard it as the result of an uncharitable and suspicious temper guided by reckless partisan bias.

At the close of the answer of Hart there is this remarkable passage: "The date of the publication may have been untimely, and if it had been considered, that said publication

of said article could be construed by any one as an attempt
to intimidate or influence the Court in the case of *Miller* v.
*Buchanan,* no such article would have been published during
the pendency of the case." Now how is it possible to believe
this statement, when the obnoxious editorial closes thus:
"Of course it was not intended that the purpose of the Court
should be made public, and publicity may induce the Court
to change its mind just to show that somebody has been tak-
ing liberties with the text and misrepresenting the Court.
We shall see what we shall see." Is there any misunder-
standing of this language? Does it admit of any two con-
structions? "Publicity may induce the Court to change its
mind to show that it has been misrepresented." Might not
the defendant, Hart, just as well have expressed this senti-
ment thus: "I expect this editorial exposing the corrupt
arrangements, which have been made by this Court, will pre-
vent it from carrying out this corrupt bargain, so as to
escape my lashings and induce the public to believe that
they have been misrepresented."

But it is said in this answer of the defendant, Hart, that he
had no personal interest in the decision of this *mandamus*
case, and that as a politician he preferred that the case should
be decided in favor of the Auditor, as it was decided after
the filing of this answer. This I suppose is true. If the
case was to be decided at all during this term, as the editor
of a Republican paper, I presume, he did prefer its being
decided as it was decided by this Court. But I can have as
little doubt, that as the editor of a Republican paper and as
a mere partisan having no regard to any interest but the
supposed interest of his party, he earnestly desired that the
case should not be decided at all during this term of the
Court, or till after the 23d day of July, 1884, when the Demo-
cratic convention for the nomination of State officers was to
held. This is a fair inference from the affidavit of his friend
Parsons, filed with his answer. The very editorial, which is
the subject of complaint, says: "The present understanding
is that the decision is to be rendered before the meeting of
the Democratic State convention in order to simplify the
situation." Now from the spirit exhibited in his editorials
and answers I hardly suppose he desired to aid the Demo-

cratic party by "simplifying the situation," even had he thought that the public interest would be promoted, and this "simplifying of the situation," he seems to have thought, would be the result of a decision of the *maudamus* case during this term of our Court. He had an interest as a mere partisan to delay the decision of this case, and on the face of this editorial it does seem to me, that he expected to effect this by intimidating this Court, a most unworthy effort induced by a most unworthy motive.

In my judgment this defendant, Hart, ought to be imprisoned as well as fined. His contempt of this Court consists of a libelous publication made in the city when the Court was sitting, charging that a majority of its members had entered into a corrupt arrangement to decide promptly a case pending before it in favor of the plaintiff, which charge was made with no other motive than a belief, that if he could prevent the Court by intimidating it from deciding the case during the present term, the political party, to which he belonged, would thereby have its interests promoted. If for such a contempt the guilty party should not be imprisoned, I can not conceive an offence in the nature of a contempt of this Court, for which any party should be imprisoned. The answer of this defendant Hart is itself highly offensive and greatly aggravates the libel, which he published, and the effect has been to cause this Court to impose on him a heavier fine than it would otherwise have done. This is generally all that can be done; for the answer would of course generally be regarded as written and filed by the direction of the client, and his counsel would generally not know whether the allegations in it were true or false, or whether or not his client believed them to be true. And ordinarily it would be the duty of counsel to file such answer as his client directed, even though it were insulting to the Court in its character. But if the counsel knew not only that the statements of the answer were false but also knew, when the answer was filed, that his client knew them to be false, then, I think, the counsel would violate their duty to the Court in filing such an answer. There is nothing on the face of Hart's answer which would justify me in saying that it is of this character. But this Court knows certain facts,

which are so notorious in their nature, that the inference is strong, that they were known to Hart, when he published this editorial of June 18, 1884, and also to his counsel, when they filed his answer, unless they had been forgotten by them, which made the filing of such answer, upon the principles I have stated, a breach of their duties to this Court.

These facts are: That this Court begins its session in Charleston on the second Wednesday in January, the very day on which the Legislature under the Constitution begins its session. The Legislature sits forty-five days, unless the session is prolonged by a two thirds vote of all the members of each house. The session when not prolonged terminates in February. This Court holds every year a special term in Wheeling, which begins in March and on a day to be fixed by the Court. Of course when the session of the Legislature is not prolonged, it has adjourned, and its members have left Wheeling before the members of this Court reach there to hold this special term. In 1883 the session of the Legislature was not prolonged; and it adjourned on February 23, 1883, while our Court commenced its session on March 7, 1883, nearly two weeks afterwards. Three members of this Court therefore could not possibly have attended as charged a Democratic caucus of this Legislature, unless two of them at least happened to be in Wheeling during a vacation of this Court, an event which has never happened since I have been on the bench during a period of eight years. Occasionally one of the members of this Court visits Wheeling, when this Court is not in session, but it is most unlikely that three members of this Court would meet here, except when the Court was in session. And as the Legislature of 1883 adjourned February 23, 1883, and this Court did not meet here till March 7, it would seem almost impossible, that three members of this Court attended as charged a Democratic caucus of the members of the Legislature. These facts, it is presumed, were known to Hart, the editor of the *Wheeling Intelligencer*, and to his counsel, one of whom resided in Wheeling and one in Parkersburg, and both of whom have a large practice in this Court and knew at what times this Court met. If counsel, when they filed the answer of Hart in this case, knew that when their client made the publica-

tion of June 18, 1884, he knew it was not true as charged, that three members of this Court attended this Democratic caucus, then they violated their obligation to this Court and should be held responsible therefor. If when a rule was issued against them, it should appear, that when they filed this answer they had forgotten, when the Legislature adjourned, and did not then recollect, that the session had not been prolonged, or when this Court met in Wheeling, or could assign any other good reason why they were not, when they filed this answer, aware that when their client on June 18, 1884, published that three members of this Court attended this caucus, that this was false, then they would not have violated their duty to this Court, and ought not to be held responsible for filing this answer for their client. Otherwise in my judgment they should be held responsible therefor as for a contempt of this Court. The other members of the Court differ with me in this respect and think no further investigation should be made in this matter.

On the 7th day of July, 1884, the opinion of the Court was announced; and thereupon the following attachment in accordance therewith at once issued:

"STATE OF WEST VIRGINIA,

"IN THE SUPREME COURT OF APPEALS,

"June Term, 1884,

" *The State of West Virginia to the Sheriff of Ohio county, greeting:*

"Whereas it has been made to appear, that John Frew and C. B. Hart have printed and published an article, which has been adjudged by the said Court, now in session at Wheeling, in the aforesaid county and State, to have been printed and published in contempt of said Court while so in session, as aforesaid. We therefore command you that you attach the said John Frew and C. B. Hart, so as to have their bodies forthwith before our said Supreme Court of Appeals here now in session at Wheeling in the county aforesaid, to answer the said Court of the said contempt, by them lately committed against it, as it is said, and further to do and receive what our said Court shall in that behalf consider. Hereof fail not and have you then and there this writ.

Witness the judges of said Court, and the seal thereof this 7th day of July, 1884.

"O. S. LONG,

" *Clerk Supreme Court of Appeals.*"

In obedience thereto the defendants at once appeared at the bar of this Court, and Johnson, President, pronounced the following sentence :

### THE SENTENCE.

"You, John Frew and C. B. Hart, are before this Court under an attachment for contempt, in consequence of an article relating to a cause in this Court, and published in a newspaper of which you and A. W. Campbell are the publishers and proprietors, and you, C. B. Hart, are the editor-in-chief.

"In the opinion delivered by this Court, when passing upon the return to the rule to show cause why an attachment should not issue against you, we have said all that we desire to say in regard to the character of the publication and the injury, which such publications tend to cause to the administration of justice. It was there held that your answers showed no reason why an attachment should not issue. It now only remains to impose on you a penalty for the offence. It is in the power of this Court to punish in this summary way such constructive contempts as that of which you have been found guilty, both by fine and imprisonment. We have no desire to inflict a severe penalty. Our object will be accomplished, if we show to you, that the law will not tolerate publications, the direct tendency of which is to degrade, impede, influence and obstruct courts in the administration of justice.

"We are not unmindful of the fact that you, John Frew, did not know that such editorial article was to be published until after its publication, and will therefore inflict upon you a nominal fine. But with you, C. B. Hart, the case is different, because in your answer while admitting that you were the chief editor of the paper and inserted said editorial therein, you attempt to justify yourself in a manner which aggravates your offence, and we shall impose upon you as moderate a fine as the circumstances will allow, as we can

not believe that you will in the future commit a similar offence.

"You, John Frew, are adjudged to pay a fine of twenty-five dollars, and you, C. B. Hart, are adjudged to pay a fine of three hundred dollars into the treasury of this State. You are also adjudged to pay the costs of this proceeding. The fines will be paid to the clerk of this Court, who is directed immediately to pay the same into the treasury of this State, and procure the receipt of the proper officer therefor. which he shall file with the papers in this case. The sheriff will hold the respondents in his custody, until the fine and costs are paid to the clerk."